**Brian W. Steffensen (3092)**
**Steffensen ◆ Law ◆ Office**
2159 South 700 East, Suite 100
Salt Lake City, Utah 84106
Telephone (801) 485-3707
Facsimile (801) 485-7140
Attorneys for Plaintiffs



RECEIVED CLERK

**FILED**

2003 OCT 14 P II: 26

U.S. ... ... URT
DISTRICT OF UTAH

# IN UNITED STATES DISTRICT COURT

## STATE OF UTAH

Glade W. James, individually and as trustee;
Kirt W. James;   Intrepid International Ltd.;
HJS Financial Services, Inc.;
Shibewalt Management, Inc.;
Intrepid International SA;
Oasis Entertainment, LLC; Oasis
Entertainment's Fourth Movie
Project; Oasis Entertainment Corp.;
Glenneyre Capital Corp;

vs.

Greg Harry, Jeff Harry, Jenna Harry,
William S. Stocker, J. Dan Sifford Jr.,
Karl E. Rodriguez, Karl E. Rodriguez Ltd;
Luke Zouvas; Sebastian Gibb; Jeffjena Ltd;
Anneius Equity Management, Inc.;
Polyandrous Trading Group Inc.;
Exim International Inc.;
Glenneyre Equity Group Ltd;
Dana Leasing, Inc.;
Patagonia Development SA;
Patagonia Commercial SA;
Quicksilver Development SA;
Marshall Worldwide LTD;
Titan Capital SA;
B&V Union Technologies Inc.;
Paladin Global Group;
Jozette Jamie Lee; Pam Fernley;
Gaynell T. Harry, trustee;
The Leeward Family Trust;
The Albright Living Trust;

Does 1-500

    Defendants.

**SECOND AMENDED COMPLAINT**

**AND JURY DEMAND**

Civil No.:  2:02cv-1147

Judge:        Dee Benson



1

**General Allegations**

1.      Federal jurisdiction arises due to the federal claims raised herein.  This court has

pendent jurisdiction over the state law claims.  Jurisdiction and/or venue is proper over all

of the defendants in the State of Utah due to the fact that substantial acts in furtherance of

the civil and criminal conspiracy and racketeering enterprise were committed by some of

the co-conspirators and racketeers in the State of Utah, and the plaintiffs have suffered

damage as a result of those acts to their persons and/or property in the State of Utah.

2.      Plaintiff Glade James is an individual residing in Utah, and has claims herein

individually and as trustee of the Dillon J. Jillian Trust (Dillon Trust).

3.      Plaintiff Kirt W. James (James) is an individual splitting his residence between

Utah and California.

4.      Plaintiff Intrepid International Ltd. (Intrepid) is a Nevada corporation.  James is and

has always been President and controlling officer and director of Intrepid.

5.      Plaintiff HJS Financial Services, Inc. (HJS) is a Nevada corporation.  James is and

has always been the President and controlling officer, director and owner of HJS.  For

example, in a Form 10-K-SB filed for Hometeach.com, Inc. filed as of June 30, 2000 and

signed and/or certified by Karl Rodriguez and Williams Stocker, it states that "Mr. Kirt W.

James is President of HJS Financial Services, Inc. and is its 100% owner.  Accordingly, the

actual shares owned by HJS is shown as attributed to Mr. James."  (See Exhibit A )

6.      Plaintiff Shibewalt Management, Inc. (Shibewalt) is a corporation.  James is and

has always been the President and controlling officer, director and sole owner of Shibewalt.

7.      Plaintiff Intrepid International SA (Intrepid SA) is a Panamanian bearer stock

corporation.  Since 1997, James is and has always been the controlling officer, director,

agent and/or owner of this entity.  James either has possession of the bearer stock of this

company, or it has been wrongfully stolen from him.

8.      Plaintiff Oasis Entertainment, LLC is a corporation.  James is and has always been

the controlling officer, director, agent and/or owner of this entity

2

9.     Plaintiff Oasis Entertainment's Fourth Movie Project is a Nevada corporation (Oasis Fourth Movie). James is and has always been the controlling officer, director, agent and/or owner of this entity. As president of Oasis Fourth Movie, James oversaw the raising of funds pursuant to a Reg A offering, the making of at least one movie, and other business activities. James continues to have a fiduciary duty to this company and its shareholders to safe-guard its assets and to make sure that they have not been mistreated by the Harry Related Defendants.

10.     Plaintiff Oasis Entertainment Corp. is a corporation. James is and has always been the controlling officer, director, agent and/or owner of this entity

11.     Plaintiff Glenneyre Capital Corp. is a corporation. James is and has always been the controlling officer, director, agent and/or owner of this entity.

12.     American Registrar & Transfer Co is an entity with offices in Utah engaged in the stock transfer business with, to and/or for entities throughout the United States, including in Utah.

13.     Richard Day is an individual residing in the State of Utah who owns, controls and/or works for American Registrar.

14.     Defendants Greg Harry (Harry), Jeff Harry, Jenna Harry, William S. Stocker (Stocker), J. Dan Sifford (Sifford), Luke Zouvas and Sebastian Gibb are individuals residing in California (collectively, with Rodriguez, referred to sometimes hereafter as the Harry Related Individual Defendants).

15.     Defendant Karl E. Rodriguez (Rodriguez) is an individual who splits his residence between California and Florida.

16.     Defendant Karl E. Rodriguez Ltd is a corporation owned and/or controlled by Rodriguez, and is one of the Harry Related Defendants.

17.     Defendant Jeffjena Ltd is an entity owned and/or controlled by Jeff and/or Jenna Harry, and is one of the Harry Related Defendants.

18.     Defendants Anneius Equity Management, Inc., Polyandrous Trading Group Inc.,

3

Exim International Inc., Glenneyre Equity Group Ltd, Dana Leasing, Inc., B&V Union Technologies Inc., Paladin Global Group; and Does 1-250 are entities that are owned and/or wrongfully controlled directly or indirectly by one or more of the Harry Related Individual Defendants; Patagonia Development SA, Patagonia Commercial SA, Quicksilver Development SA, Marshall Worldwide LTD, Titan Capital SA are entities that were organized by James and Stocker as bearer corporations and were to be owned, controlled and utilized for the benefit of James, like Intrepid SA and Intrepid Ltd., but the Harry Related Individual Defendants have wrongfully usurped control over them and/or utilized them to receive and then transfer the parties' assets out of the custody and control of HJS, Intrepid and/or James pursuant to the civil and criminal conspiracy and racketeering activity complained of herein (all of which corporations are referred to sometimes hereafter collectively as the Harry Related Corporate Defendants)(the Harry Related Individual Defendants and the Harry Related Corporate Defendants may be referred to sometimes collectively hereafter as the Harry Related Defendants).

19.    Defendants Jozette Jamie Lee ("Lee") and Pam Fernley ("Fernley") are individuals who James believes are living in Utah.

20.    Defendants Gaynell T. Harry, trustee; The Leeward Family Trust; and The Albright Living Trust are trusts owned and/or controlled by Greg Harry and have aided and abetted him in the wrongdoing complained of herein, and/or have received the proceeds of the wrongdoing perpetrated as alleged herein and are holding any property which they possess, therefore, in constructive trust for the benefit of the Plaintiffs and/or subject to an equitable lien in favor of the Plaintiffs. These defendants are part of the Harry Related Defendants.

21.    Laurencio Jaen O.; Leopoldo Kennion G.; Teodoro F. Franco L. (the Intrepid SA nominees); Nixia Aurora Zerna aka Nixia A. Zerna (the Marshall/Patagonia/Quicksilver nominee) are Panamanian citizens.

22.    Kevin Harrington and Tim Harrington (the "Harringtons") are individuals residing in Florida. Reliant Interactive Media Corp. (Reliant) is a wholly owned subsidiary of

4

Thane.

23.    Union Bank of California is a banking corporation with its principal offices in California.

24.    Union Securities Ltd is a Canadian entity engaged in the buying and selling of securities in the United States "Over the Counter" and "NASDAQ" markets, and which does business with, to and/or for entities in various States, including in the State of Utah.

25.    Dominic Busto is an individual residing in Vancouver, Canada, who while working with Union Securities did business with, to and/or for clients and/or other entities located throughout the United States, including in the State of Utah.

26.    Madison Stock Transfer, Inc. is an entity engaged in the stock transfer business with principal offices in New York

27.    Michael Ajzenman is an individual who owns and/or controls Madison and in which capacity has done business with, to and/or for clients and/or other entities located throughout the United States, including the State of Utah.

28.    Bank of Montreal is a Canadian banking entity which does business with, to and/or for clients and/or other entities located throughout the United States, including in the State of Utah.

29.    Deborah Caldwell is an individual residing and/or working in Vancouver, Canada, for Bank of Montreal, who did and does business with, to and/or for clients and/or other entities located throughout the United States, including in the State of Utah.

30.    Equitrade Securities Inc. is a corporation engaged in the securities business with principal offices in California, but which does business with, to and/or for clients and/or other entities located throughout the United States, including in the State of Utah

31.    Don Carrig, Stephen H. Roebuck and Kim Carroll are individuals who own, control and/or work for Equitrade and who do business with, to and/or for clients and/or other entities located throughout the United States, including in the State of Utah.

32.    Canaccord Capital Corp is a Canadian entity which engages in the securities

business and which buys and sells stock for and/or with individuals and/or entities throughout the United States via the "Over the Counter" and "NASDAQ" markets, and otherwise, including in the State of Utah.

33.    Brad Scharfe and John Skinner are individuals which own, control and/or work for Canaccord, and who do business with, to and/or for clients and/or other entities located throughout the United States, including in the State of Utah.

34.    MJK Clearing Services is an entity which clears trades for one or more of the securities companies which are defendants herein, and which engages in the securities business and which clears buys and sales of stock for and/or with individuals and/or entities throughout the United States via the "Over the Counter" and "NASDAQ" markets, and otherwise, including in the State of Utah.

35.    Royal Bank of Canada is a Canadian banking entity which does business with, to and/or for individuals and/or entities throughout the United States, including in the State of Utah.

36.    West America Securities is an entity engaged in the securities business and which buys and sells stock for and/or with individuals and/or entities throughout the United States via the "Over the Counter" and "NASDAQ" markets, and otherwise, including in the State of Utah.

37.    Yorkton Securities is an entity which was engaged in the securities business, but which has been purchased by Canaccord, and which buys and sells stock for and/or with individuals and/or entities throughout the United States via the "Over the Counter" and "NASDAQ" markets, and otherwise, including in the State of Utah.

38.    John Skinner owned, controlled and/or worked for Yorkton Securities and during the course of said duties engaged in the securities business for and/or with individuals and/or entities throughout the United States via the "Over the Counter" and "NASDAQ" markets, and otherwise, including in the State of Utah.

39.    Morgan Stanley Dean Witter & Co. is an entity engaged in the securities business

and which buys and sells stock for and/or with individuals and/or entities throughout the United States via the "Over the Counter" and "NASDAQ" markets, and otherwise, including in the State of Utah.

40.    Richard Frank and Emily Ysais work for Morgan Stanley and are engaged in securities and/or other transactions for and/or with individuals and/or entities throughout the United States, including in the State of Utah.

41.    Global Securities is an entity engaged in the securities business and which buys and sells stock for and/or with individuals and/or entities throughout the United States via the "Over the Counter" and "NASDAQ" markets, and otherwise, including in the State of Utah.

42.    Steve Regoci is an individual who during relevant times worked for Global Securities and as such engaged in securities and/or other transactions for and/or with individuals and/or entities throughout the United States, including in the State of Utah.

43.    Dundee Securities is an entity engaged in the securities business and which buys and sells stock for and/or with individuals and/or entities throughout the United States via the "Over the Counter" and "NASDAQ" markets, and otherwise, including in the State of Utah.

44.    John Horword is an individual who during relevant times worked for Dundee Securities and engaged in the securities business with, to and/or for individuals and/or entities throughout the United States, including in the State of Utah.

45.    EH&P Investments AG is an entity engaged in the securities business and which buys and sells stock for and/or with individuals and/or entities throughout the United States via the "Over the Counter" and "NASDAQ" markets, and otherwise, including in the State of Utah.

46.    Erwin Haas owns, controls and/or works for EH&P who during relevant times engaged in the securities business with, to and/or for individuals and/or entities throughout the United States, including in the State of Utah.

7

47.    MFC Merchant Bank SA is an entity engaged in the securities business and which buys and sells stock for and/or with individuals and/or entities throughout the United States via the "Over the Counter" and "NASDAQ" markets, and otherwise, including in the State of Utah.

48.    Marta Pardo and Michael Smith are individuals who during relevant times worked for MFC and engaged in the securities business with, to and/or for clients and/or other entities throughout the United States, including in the State of Utah.

49.    Golden Capital Securities, Ltd is an entity engaged in the securities business and which buys and sells stock for and/or with individuals and/or entities throughout the United States via the "Over the Counter" and "NASDAQ" markets, and otherwise, including in the State of Utah.

50.    Mellon Securities Trust Corp is an entity engaged in the securities business and which buys and sells stock for and/or with individuals and/or entities throughout the United States via the "Over the Counter" and "NASDAQ" markets, and otherwise, including in the State of Utah.

51.    Swiss American Securities is an entity engaged in the securities business and which buys and sells stock for and/or with individuals and/or entities throughout the United States via the "Over the Counter" and "NASDAQ" markets, and otherwise, including in the State of Utah.

52.    LOM is an entity engaged in the securities business and which buys and sells stock for and/or with individuals and/or entities throughout the United States via the "Over the Counter" and "NASDAQ" markets, and otherwise, including in the State of Utah.

53.    Trevo Kidd is an individual who during relevant times owned, controlled and/or worked for LOM and engaged in the securities business with, to and/or for clients and/or other entities throughout the United States, including in the State of Utah.

54.    Cardinal Capital Management Inc. is an entity engaged in the securities business and which buys and sells stock for and/or with individuals and/or entities throughout the

United States via the "Over the Counter" and "NASDAQ" markets, and otherwise, including in the State of Utah.

55.    Chris Dorst is an individual who during relevant times owned, controlled and/or worked for Cardinal Capital and who engaged in the securities business with, to and/or for clients and/or other entities throughout the United States, including the State of Utah.

56.    Bank August Roth AG is a Swiss banking entity which does business with, to and/or for clients and/or other entities throughout the United States, including the State of Utah.

57.    Credit Lyonnais (Schweiz) AG is a foreign banking and/or financing entity which does business with, to and/or for clients and/or other entities throughout the United States, including the State of Utah.

58.    Bank Sal. Oppenheim jr. & Cie. is a foreign banking and/or financing entity which does business with, to and/or for clients and/or other entities throughout the United States, including the State of Utah.

59.    Public Securities is an entity based in Spokane, Washington, which is engaged in the securities business and which buys and sells stock for and/or with individuals and/or entities throughout the United States via the "Over the Counter" and "NASDAQ" markets, and otherwise, including in the State of Utah.

60.    Michael Bascetta is an individual who owns, controls and/or works for Public Securities and engages in the securities business with, to and/or for individuals and/or entities throughout the United States via the "Over the Counter" and "NASDAQ" markets, and otherwise, including in the State of Utah.

61.    The foregoing banks, brokerage houses and financial services firms, plus the individuals identified in connection with them,  will sometimes be referred to collectively hereafter as the Banks and/or Brokerage Houses.

62.    Defendants Does 1-500 are individuals and/or entities which are liable to the plaintiffs pursuant to one or more of the claims for relief herein, but whose entities are not

9

presently known to the plaintiffs, who reserve the right to amend this complaint to set forth appropriate identifying and charging allegations when sufficient information to do so is obtained.

63.    In 1991, James, Harry and Stocker decided to come together and engage in the business of providing corporate and financial services to clients. In furtherance of this decision, the following entities were formed:

a.    HJS was formed to deal directly with customers and third-parties. James was named president and sole owner of HJS. Stocker was named secretary and general counsel. Harry could not be an officer, director or shareholder in HJS because he had previously been convicted of certain securities related felonies and had been barred from the securities industry (See Exhibit B ). He could only act in a limited capacity as a consultant to HJS. As a result, it was always understood and agreed that at no time could or was Harry ever authorized to transfer funds and/or stock in or out of any bank or brokerage accounts owned by HJS. Harry was never given authority to act for or on behalf of HJS.

b.    James, Stocker and Harry each formed family trusts, which became the equal members of Glenneyre Equity Group, Ltd. (Glenneyre Equity) Glade James is trustee of the Chevy-Chase Living Trust, a member of Glenneyre Equity.

c.    Glenneyre Capital Corp. (Glenneyre Capital) was formed to perform escrow functions, and also to record transactions between and among various entities.

64.    From the time of the formation of HJS and Glenneyre Capital, James was in full and complete control of them both.

65.    In 1997, James obtained ownership and control over a Panamanian bearer stock corporation, Intrepid International, SA, and caused a Nevada corporation to be formed, Intrepid International Ltd. The Panamanian nominees remained in apparent control of Intrepid SA, but the bearer stock and appropriately signed proxies/resignations were delivered to James and are in his possession – unless they have been stolen by one or more

of the defendants – which makes James the sole owner of Intrepid SA. James caused Sifford to be named "manager" of Intrepid Ltd, but James remained president and chief executive officer and agent of Intrepid Ltd. It was agreed and always understood that James would have the same control over Intrepid Ltd as he had over HJS – 100% control and authority. Again, Harry could not have, and was not given, any authority to transfer funds and/or stock in or out of any bank or brokerage accounts owned by Intrepid SA or Intrepid Ltd. Harry was strictly limited by his circumstances to acting as a consultant and giving advice. Harry could not own assets or accounts, and could not control or direct any businesses or accounts.

66.    Like Intrepid SA, James caused Patagonia Development SA (Pagatonia Development), Patagonia Commercial SA (Patagonia Commercial), Quicksilver Development SA (Quicksilver), Marshall Worldwide Ltd (Marshall), B&V Union Technologies Inc. and Titan Capital SA (Titan) to be formed in Panama as bearer stock corporations, with the stock thereof and appropriate resignations and proxies delivered to James. Again, it was always understood and agreed that James would be a controlling officer and/or agent of each of them. James has possession of the stock of these companies, unless they have been stolen from him. Again, Harry could not and was never authorized to transfer funds and/or stock in or out of any bank or brokerage accounts owned by any of these entities. Harry was strictly limited by his circumstances to acting as a consultant and giving advice. Harry could not own assets or accounts, and could not control or direct any businesses or accounts.

67.    James opened bank accounts and various brokerage accounts with one or more of the Banks and/or Brokerage Houses for and on behalf of the various corporations, with James listed on the account documents as controlling officer/agent.

68.    As indicated above, Harry was not allowed to direct the affairs of these entities, due to his past and the restrictions on his activities. Stocker was never authorized to do anything other than act as corporate secretary and/or counsel for these entities.

69.     Much effort was made to provide services for third parties and clients, and to earn fees as a result thereof, and to acquire stock positions in various companies. In this regard, James was always the client contact and principal for and/or of HJS and Intrepid. This included substantial activity with businesses, like American Registrar, in the State of Utah. Over the course of many years, HJS and/or Intrepid, directly or through their affiliates – including one or more of the other plaintiff corporations, and various of the defendant corporations, acquired stock in various entities that were in the process of going public and raising capital. Usually this stock was owned either by HJS or Intrepid, but sometimes portions would be "owned" and/or otherwise held in other entities' names. Unless already distributed in whole or in part to specific participants uniquely involved in a particular deal as directed by James, however formally "owned," all of this stock and the proceeds thereof were owned in constructive trust for the benefit of HJS and/or Intrepid. Due to James' key role and activities in the various deals, James made it clear to the defendants, and it was always agreed and understood by them, that James' personal share in any particular deal after it was consummated and proceeds therefrom were divvied up would never be less than one-third.

70.     HJS' and/or Intrepid's efforts were in many regards very successful, and the stock and monies earned and/or otherwise acquired became worth what James estimates to have been in excess of twenty million dollars. When James removed a safe with stocks owned and/or controlled by HJS and/or Intrepid on July 23, 2001 as alleged hereafter, Stocker and Harry filed a police report declaring that the stocks in the safe were worth $25,000,000.00. See Exhibit C)

71.     Sifford, Rodriguez, Jeff Harry and Jenna Harry became involved in HJS' and/or Intrepid's business, as employees. After James refused to work with Harry any further, Harry brought Luke Zouvas and Sebastian Gibb into the office and they began working with Harry. Upon information and belief, all of these individuals were controlled by and/or aligned with Harry and adopted his purposes and designs and became a part of his and

Stocker's civil and criminal conspiracy, and racketeering enterprise.

72.    When Harry asked James to hire some of these individuals and/or otherwise bring them into HJS' and Intrepid's business, James initially agreed but then complained as it became apparent to James that rather than follow James' directives, they were taking orders from Harry – even though it had always been agreed and understood that Harry would have no executive/management role.    Harry became increasingly bold in asserting influence over business matters.    So much so, that Harry and/or the other Harry Related Individual Defendants began improperly making day to day business decisions without even consulting James.

73.    From 1999 on James began discovering evidence that Harry and his cohorts were misusing assets and proceeds, and/or siphoning off to themselves funds and/or stock to which the Harry Related Defendants were not entitled. James began confronting Harry and objecting to Harry directing endless trades which James did not understand but suspected were illegal, and to Harry causing proceeds from sales of HJS and/or Intrepid stock to be diverted to accounts controlled by Harry. In order to carry out this scheme to defraud the plaintiffs and/or to obtain property or money from the plaintiffs through false pretenses, misrepresentation and the like, Harry sent directives by mail and/or fax and/or telephone from HJS' and Intrepid's California offices to various stock brokerages located in other States and to some located outside the United States (in Canada or Switzerland). As a result of these directives, stock owned directly or beneficially by plaintiffs was sold and/or transferred.    Harry communicated via the mails and/or telephone lines (fax and voice) across state lines and/or international borders to these brokerages, causing them to transfer all or a portion of the proceeds of these sales and/or transfers ultimately out of HJS', Intrepid's, James' or the other plaintiffs' names and/or control.  This activity was conducted as part of the Harry Related Defendants' scheme to defraud plaintiffs, and/or to obtain property and/or monies from plaintiffs through false pretenses, misrepresentations and the like.    Each separate directive or communication in connection with these trades

13

and/or transfers constituted separate acts of mail and/or wire fraud (18 USC 1341 and 1343), and separate predicate acts of racketeering activity (18 USC 1961(1)).

74.    The subsequent transfer of securities and/or monies to accounts owned by and/or controlled by the Harry Related Defendants, as part of or after these acts of wire and/or mail fraud, and racketeering activity, violated 18 U.S.C. 1956 and 1957. The stock and/or money obtained from these transfers constituted the "proceeds" of unlawful activity (violations of 18 USC 1961 et seq.), and were undertaken with the intent of carrying on that unlawful racketeering activity; and/or as transactions designed in whole or in part to conceal or disguise the nature, the location, the source, the ownership and/or control of the proceeds of the racketeering activity in violation of 18 USC 1956(a)(1)(A) and (B).

75.    The Harry Related Defendants caused the stock and/or money obtained from the stock transfers and/or sales referred to above to be transported, transmitted and/or transferred either from within the United States to one or more places outside the United States, and/or from outside United States to a place within the United States, with the intent to promote and/or accomplish the aforementioned and described racketeering activity in violation of 18 USC 1956(a)(2)(A).

76.    The Harry Related Defendants caused the stock and/or money obtained from the stock transfers and/or sales referred to above to be transported, transmitted and/or transferred either from within the United States to one or more places outside the United States, and/or from outside United States to a place within the United States, knowing that the monetary instrument or funds involved in the transportation, transmission or transfer represented the proceeds of some form of unlawful activity and knowing that such transportation, transmission, or transfer was designed in whole or in part to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of the unlawful activity in violation of 18 USC 1956(a)(2)(B)(i).

77.    The Harry Related Defendants with intent to promote the scheme or artifice to defraud the plaintiffs and/or to wrongfully obtain possession of the plaintiffs property

14

through false pretenses, misrepresentation and the like, and after having utilized the mails and/or interstate wire transmissions to further said scheme, conducted or attempted to conduct numerous financial transactions involving property which was the proceeds of the scheme to defraud the plaintiffs in violation of 18 USC 1956(a)(3)(A).

78.    The Harry Related Defendants with intent to conceal or disguise the nature, location, source, ownership, or control of property which they knew or believed was the proceeds of the aforementioned unlawful activity, conducted or attempted to conduct financial transactions involving property which was the proceeds of the scheme to defraud the plaintiffs in violation of 18 USC 1956(a)(3)(B).

79.    The Harry Related Defendants, acting within the United States and without the United States but as United States citizens, knowingly engaged and/or attempted to engage in monetary transactions in criminally derived property of a value greater than $10,000 which was derived from the aforementioned unlawful activity in violation of 18 USC 1957.

80.    All of the Harry Related Defendants' acts of mail or wire fraud and subsequent money laundering constituted separate predicate acts and part of the Harry Related Defendants' pattern of racketeering conduct. The Harry Related Defendants continue to this day to engage in this same type of conduct – especially continued acts of money laundering – and will continue to commit such predicate acts until all of the proceeds of their wrongdoing is forfeited and returned to its rightful owner(s) – the plaintiffs.

81.    In late 2000, James became so tired from battling with Harry and trying to keep him and the other Harry Related Defendants from committing the foregoing types of criminal wrongdoing, that James literally became ill and unable to work as much in the business. James at this time was also struggling with a drug problem – induced in substantial part by Harry.   When James began to experience his health problems, upon information and belief, the Harry Related Individual Defendants believed and/or hoped that James would not be physically or emotionally capable of stopping them from committing the aforementioned types of wrongful acts.

15

82.    As indicated above, at some point in time during 1999 or 2000, the Harry Related Defendants devised a scheme to defraud HJS, Intrepid, James and the other plaintiffs, and/or a scheme for obtaining money or property owned by the plaintiffs by means of false or fraudulent pretenses, representations and/or promises.  The Harry Related Defendants decided to take steps to convert and steal the plaintiffs' stock and other property, and indirectly thereby James' share of the business' profits and assets accumulated to date – and to usurp control over substantial blocks of stock in approximately two dozen different corporations.  As part of this plan – after James became ill and quit coming into work as much – the Harry Individual Defendants devised a scheme and engaged in a civil and criminal conspiracy to initially impersonate James and/or forge his signature to critical business documents and then to actually remove James from control of HJS, Intrepid Ltd., Intrepid SA, the other corporate plaintiffs, Patagonia Development SA, Patagonia Commercial SA, Quicksilver Development SA, Marshall Worldwide LTD and Titan Capital SA (and possibly other companies like Oasis Fourth Movie); all in furtherance of their scheme to siphon off and/or out of said entities and the plaintiff trusts, and into entities owned and/or controlled by the Harry Related Defendants, all of the monies and/or stock which had been acquired as a result of HJS' and Intrepid's efforts up through that time and/or which the plaintiffs would obtain and/or be entitled to receive in the future from pending projects.

83.    The Harry Related Defendants also wanted to be able to take control of the stock and/or affairs of the approximately two dozen companies referred to above which were clients of and/or controlled by HJS, Intrepid and/or James.   When James was well, he would not allow Harry to engage in improper conduct with respect to this stock and/or these companies.  With James out of the way, Harry was essentially free to do anything that he wanted with these companies and their stock – including committing massive stock price manipulation and stock fraud to the detriment of these companies and their innocent shareholders.

84.    Even though James was not going into the office as much, in 2001 James learned about instances where stock and/or funds were transferred out of HJS, Intrepid Ltd, Intrepid SA, the other plaintiffs, Patagonia Development SA, Patagonia Commercial SA, Quicksilver Development SA, Marshall Worldwide LTD and Titan Capital SA, which James had not previously known about or authorized.  James discovered that the Harry Related Defendants were forging his name on checks, wiring instructions, stock transfer directives, and corporate and SEC filings.

85.    Seriously concerned about this conduct by the Harry Related Defendants, on or about July 23, 2001, James entered the business premises of HJS and Intrepid Ltd  (James' name was on the lease) and temporarily locked the Harry Related Defendants out while he removed and inventoried certain of the assets and business records for the plaintiffs and their client corporations for which James acted as president or other responsible officer and with respect to which James had a fiduciary responsibility.

86.    James' review of the business records which he obtained proved his suspicions to be true.  It appeared to James from these records that the Harry Related Defendants had been misusing assets and depriving HJS, Intrepid, James and/or  the other plaintiffs of their ownership and/or their share of these assets.

87.     Prior to this point in time – July 23, 2001 – James had caused brokerage and bank accounts to be opened with the banks and brokerages identified above on behalf of the plaintiffs, Patagonia Development SA, Patagonia Commercial SA, Quicksilver Development SA, Marshall Worldwide LTD and Titan Capital SA and other entities.  For all accounts opened by James, James was the only person authorized to transfer money and/or stock out of those accounts.   The Harry Related Defendants devised a scheme to defraud plaintiffs of the stock and money held in these brokerage and bank accounts.

88.    The following are examples of the wrongful conduct discovered by James:

    a.    Attached as Exhibit D is an instruction to Deborah Caldwell of the Bank of Montreal telling her to expect a wire transfer into an Intrepid Ltd account, and directing her

to transfer those funds from the Intrepid account to a Patagonia Commercial Account. It has the forged signature of Kirt James. Upon information and belief this was sent by one of the Harry Related Individual Defendants by fax from California to Vancouver, British Columbia some time in late 2000. This faxed, forged directive in furtherance of the scheme to defraud the plaintiffs and/or to obtain possession of their property and/or money through false pretenses and misrepresentations violated 18 USC 1343 (Wire Fraud). The actual transfer, transportation and/or transmittal of these proceeds of unlawful activity violated 18 USC 1957 and 1956 (Money Laundering) as described in paragraphs 74 - 79 above.

     b.   Attached hereto as Exhibit E is a letter to Deborah Caldwell of the Bank of Montreal. It has the forged signature of Kirt James. Upon information and belief this was sent by Jeff Harry by fax from California to Vancouver, British Columbia in late December, 2000. This faxed, forged letter in furtherance of the scheme to defraud the plaintiffs and/or to obtain possession of their property and/or money through false pretenses and misrepresentations violated 18 USC 1343 (Wire Fraud). The actual transfer, transportation and/or transmittal of these proceeds of unlawful activity violated 18 USC 1957 and 1956 (Money Laundering) as described in paragraphs 74 - 79 above.

     c.   Attached hereto as Exhibit F is a fax instruction purportedly from Intrepid International SA to Union Securities in Vancouver, British Columbia. This was created and faxed by one of the Harry Related Individual Defendants from California to Canada on or about December 21, 2000. The signature of Laurencio Jaen Ocana is a forgery. James never saw the Panamanian attorneys actually do any such business. Further the "Kirt W. James Accepting" language is also false. James knew nothing of this directive. James believes that the funds involved were derived from unauthorized sales of HJS and/or Intrepid stock held on account at Union Securities. As such, the faxed directive to transfer these monies constitutes a violation of 18 USC 1343 (Wire Fraud). The actual transportion, transfer and/or transmittal of these proceeds from unlawful activity as

directed by this communication was a violation of 18 USC 1956 and 1957 as described in paragraphs 74 - 79 above.

d.  Attached hereto as Exhibit G is a fax instruction purportedly from HJS Financial services and Kirt James. This was created and faxed by one of the Harry Related Defendants from California to Canada on or about June 19, 2001. (After James had supposedly "resigned" as officer and director of HJS)  This directed that monies be transferred from a Canadian HJS account over which James had control, to a United States bank account not controlled by James. James had nothing to do with this directive. It was wholly unauthorized. This faxed, false directive in furtherance of the scheme to defraud the plaintiffs and/or obtain possession of the plaintiffs' money and/or property, violated 18 USC 1343 (Wire Fraud). The actual transfer, transportation or transmittal of these funds, which were the proceeds from unlawful activity, from Canada to the United States violated 18 USC 1956 and 1957 (Money Laundering) as described in paragraphs 74 - 79 above.

e.  Attached hereto as Exhibit H is a fax instruction purportedly from Intrepid Ltd and Kirt James. This was created and faxed by one of the Harry Related Defendants from California to Canada on or about June 27, 2001. (Again, after the date on which James supposedly "resigned" as officer and director of Intrepid)  This directed that monies be transferred from a Canadian Intrepid brokerage account over which James had control, to a United States bank account not controlled by James. James had nothing to do with this directive. It was wholly unauthorized. This faxed, false directive in furtherance of the scheme to defraud the plaintiffs and/or obtain possession of the plaintiffs' money and/or property, violated 18 USC 1343 (Wire Fraud). The actual transfer, transportation or transmittal of these funds, which were the proceeds of unlawful activity, from Canada to the United States violated 18 USC 1956 and 1957 (Money Laundering) as described in paragraphs 74 - 79 above.

f.  Attached hereto as Exhibit I is a fax directive purportedly from HJS. This was created by Greg Harry without any authority and faxed to Equitrade Securities on or about

January 11, 2001. This resulted in funds from the sale of plaintiffs' stock which was held at Equitrade to be transferred from an account which should have been controlled by James to a bank account which was not controlled by James. The faxing of this directive in furtherance of the scheme to defraud the plaintiffs and/or to obtain their money and/or property through false pretenses violated 18 USC 1343 (Wire Fraud). The actual transmitting, transporting and/or transferring of the proceeds of unlawful activity violated 18 U SC 1956 and 1957 as described in paragraphs 74 - 79 above.

g.    Attached hereto as Exhibit J is a fax directive purportedly from HJS and signed by Greg Harry. This was created, signed and faxed by Harry on or about January 16, 2001 to Equitrade Securities. This directed that stock held in the name of HJS at Equitrade be transferred/transmitted from the United States to Canaccord Capital in Canada and into the account of Patagonia Commercial. This resulted in stock being transferred from an HJS account over which James should have had control, to an account out of the country owned by one of the Harry Related Defendants and over which James had no control. This was faxed in furtherance of the scheme to defraud the plaintiffs and/or to obtain their money and/or property through false pretenses. The actual transmitting, transporting and/or transferring of these monetary instruments in furtherance of the scheme to defraud, and/or representing the proceeds of unlawful activity, and otherwise violated 18 U SC 1956 and 1957 as described in paragraphs 74 - 79 above.

h.    Attached hereto as Exhibit K is a fax directive purportedly from HJS and again signed by Greg Harry. This was created, signed and faxed by Harry on or about January 16, 2001 to Equitrade Securities. This directed that stock held in the name of HJS at Equitrade by transferred/transmitted from the United States to Canaccord Capital in Canada and into an account owned by Intrepid International, Ltd. This was faxed in furtherance of the scheme to defraud the plaintiffs and/or to obtain their money and/or property through false pretenses. The actual transmitting, transporting and/or transferring of monetary instruments in furtherance of a scheme to defraud, and/or representing the

20

proceeds of unlawful activity, and otherwise violated 18 U SC 1956 and 1957 as described in paragraphs 74 - 79 above.

i.    Attached hereto as Exhibit L is a fax directive purportedly from Intrepid International SA and Laurencio Jaen Ocana. This was created and faxed by one of the Harry Related Individual Defendants to Morgan Stanley Dean Witter (both apparently in California). This caused stock owned by Intrepid SA in the United States to be transferred/transported to Yorkton Securities in Canada to an account owned by Patagonia Commercial. The actual transmitting, transporting and/or transferring of monetary instruments in furtherance of a scheme to defraud, and/or representing the proceeds of unlawful activity, violated 18 U SC 1956 and 1957 as described in paragraphs 74 - 79 above.

j.    Attached hereto as Exhibit M is a letter written by William Stocker to Madison Stock Transfer Inc. on or about February 20, 2001. Stocker sent with this letter the stock certificates indicated thereon, including two stock certificates in Kirt James' name, and caused the transfer agent to cancel said stock certificates and to issue a single new stock certificate in the name of Intrepid International SA. Stocker did not have authorization to so handle Intrepid International SA's stock, or Kirt James' stock. This letter was mailed from California to New York by Stocker in furtherance of the Harry Related Defendants' scheme to defraud plaintiffs and/or to obtain possession of their property through false pretenses in violation of 18 USC 1341 (Mail Fraud). The mailing of the consolidated stock certificate back from New York to Stocker in California constituted another act of Mail Fraud.

k.    Attached hereto as Exhibit N is a fax directive from Greg Harry on behalf of another Harry Related Defendant – Quicksilver – to a stock brokerage in Switzerland. This fax tells the Swiss stock brokerage to expect and receive into accounts for Quicksilver Development, Titan Capital and Patagonia Commercial certain stock which was originally owned by one or more of the plaintiffs, but which by this transfer is now being placed by

Harry beyond the control of the plaintiffs in a foreign brokerage house. The faxing of this directive in furtherance of the scheme to defraud plaintiffs and/or obtain their money and/or property through false pretenses violated 18 USC 1343 (Wire Fraud). The actual transmitting, transporting and/or transferring of these securities/ monetary instruments, in furtherance of the scheme to defraud and/or which are the proceeds of unlawful activity violated 18 U SC 1956 and 1957 as described in paragraphs 74 - 79 above.

l.   Attached hereto as Exhibit O is a fax directive purportedly from HJS signed by Greg Harry. Greg Harry created and faxed this directive from California to MFC Merchant in Switzerland. This directs MFC to transfer stock owned by HJS to Canaccord Capital in Canada to an account not owned by HJS. The faxing of this directive in furtherance of the scheme to defraud plaintiffs and/or to obtain their money and/ or property through false pretenses violated 18 USC 1343 (Wire Fraud). The actual transmitting, transporting and/or transferring of these securities/ monetary instruments, in furtherance of the scheme to defraud and/or which are the proceeds of unlawful activity violated 18 U SC 1956 and 1957 as described in paragraphs 74 - 79 above.

m.   Attached hereto as Exhibit P is a fax directive from Karl Rodriguez to Morgan Stanley Dean Witter. It was created and faxed by Rodriguez on or about June 27, 2001 and directed Morgan Stanley to transmit/transfer certain shares of stock from California to Global Securities in Canada. This stock was originally owned by HJS and/or Intrepid, and/or was being held by Rodriguez in trust for HJS and/or Intrepid. The transfer of these shares from the United States to Canada was part of the scheme to defraud plaintiffs and/or obtain their property by false pretenses.    The actual transmitting, transporting and/or transferring of these securities/ monetary instruments, in furtherance of the scheme to defraud and/or which are the proceeds of unlawful activity violated 18 U SC 1956 and 1957 as described in paragraphs 74 - 79 above.

n.   Attached hereto as Exhibit Q is a fax directive purportedly from Marshall Worldwide Ltd, and Karl Rodriguez. Rodriguez created and faxed this directive from

22

California to Union Securities in Canada. This directs Union Securities to transfer funds derived from the sale of stock which was originally owned by HJS and/or Intrepid, and/or which was supposed to be held by Marshall Worldwide Ltd in trust for HJS and/or Intrepid. The faxing of this directive in furtherance of the scheme to defraud plaintiffs and/or to obtain their money and/or property through false pretenses violated 18 USC 1343 (Wire Fraud). The actual transmitting, transporting and/or transferring of monies in furtherance of a scheme to defraud, and/or which represent the proceeds of the scheme to defraud, and otherwise violated 18 USC 1956 and 1957 as described in paragraphs 74 - 79 above.

o.    Attached hereto as Exhibit R is a fax directive purportedly from Dana Leasing, Greg Harry, William Stocker and Deborah Miller. It was created and faxed by one or more of these individuals on July 10, 2001 to West America Securities in another State. It directs West America to transfer/transmit certain shares of stock from the United States to Union Securities in Canada. These shares were originally owned by HJS and/or Intrepid and/or were being held in trust by Dana Leasing for the benefit of HJS, Intrepid and/or James. The faxing of this directive in furtherance of the scheme to defraud plaintiffs and/or to obtain their money and/or property through false pretenses violated 18 USC 1343 (Wire Fraud). The actual transmitting, transporting and/or transferring of these monetary instruments in furtherance of the scheme to defraud and/or as proceeds of the unlawful activity violated 18 USC 1956 and 1957 as described in paragraphs 74 - 79 above.

p.    Attached as Exhibit S is a fax directive purportedly from Patagonia Commercial to Dundee Securities. This was created and faxed by one of the Harry Related Individual Defendants. James does not believe from his experience that Nixia Aurora Zerna had anything to do with this. It was faxed from the Harry Related Defendants' office in California to another State on or about June 8, 2001. It directs that shares of stock in Patagonia Commercial's account in the United States be transferred/transmitted to Yorkton Securities in Canada. These shares were originally owned by HJS and/or Intrepid

and/or should have been held by Patagonia Commercial in trust for HJS, Intrepid and/or James. The faxing of this directive in furtherance of the scheme to defraud plaintiffs and/or to obtain their property by false pretenses violated 18 USC 1343 (Wire Fraud). The transfer, transmittal or transportation of these monetary instruments in furtherance of the scheme to defraud and/or as the proceeds of the defendants' illegal racketeering activity, or otherwise, violates 18 USC 1956 and 1957 as described in paragraphs 74 - 79 above.

      q.   Attached hereto as Exhibit T is a chart prepared by plaintiffs after reviewing the Union Securities account statements for Intrepid and HJS. This chart shows transfers of stock and money out of these accounts which plaintiffs believe were accomplished without proper authorization by the plaintiffs and in furtherance of the Harry Related Defendants' scheme to defraud plaintiffs and to obtain plaintiffs' money and assets through false pretenses. Each entry has the date of the transaction, and shows what type of transaction it was. Upon information and belief, on or about the date listed for each such transaction, one of the Harry Related Defendants utilized the interstate telephone systems and/or the mails to instruct Union Securities to effect the indicated transaction. Each such communication from California to Canada was in furtherance of the scheme to defraud plaintiffs and/or to obtain plaintiffs' property through false pretenses and was either an instance of mail fraud (18 USC 1341) or wire fraud 918 USC 1343)(constituting not less than seventy (70) separate and distinct instances of mail or wire fraud). Each directive to Union Securities to transfer/transmit funds and/or securities – monetary instruments – in furtherance of the scheme to defraud and/or representing the proceeds of the unlawful activity associated with each such transaction was a separate instance of money laundering (18 USC 1956 and 1957)(again, seventy (70) separate violations). All actions were each separate predicate acts of racketeering activity.

89.   Further, James discovered that the Harry Defendants had committed bank fraud in furtherance of their scheme to defraud plaintiffs as follows:

      a.   Attached hereto as Exhibit U is a copy of checks written on Intrepid

International's Bank of Montreal check account. The top two checks have the forged signature of Kirt James. One of the Harry Related Individual Defendants forged James' signature on these two checks in furtherance of their scheme to defraud the defendants. One of the checks was signed on October 11, 2000; the other on October 20, 2000. By so doing, the Harry Related Defendants knowingly executed a scheme or artifice to defraud a financial institution or to obtain monies under the custody or control of Bank of Montreal by false or fraudulent pretenses in violation of 18 USC 1344 (Bank Fraud).

      b.    Stocker and Harry contacted Union Bank of California and other banks at which HJS and/or Intrepid had accounts which had been opened by James, and falsely told said institutions that James was no longer an authorized signer on said accounts, and falsely gave other individuals "authorization" to sign on these accounts. Upon information and belief this was accomplished utilizing the mails and in some instances interstate telephonic transmissions. All such uses of the mails in furtherance of the scheme to defraud the plaintiffs and/or to obtain the plaintiffs' money violated 18 USC 1341 (Mail Fraud). All uses of the interstate telephone system in furtherance of the scheme to defraud the plaintiffs and/or to obtain the plaintiffs' money violated 18 USC 1344 (Wire Fraud). These actions also constituted a scheme or artifice to defraud a financial institution or to obtain monies under the custody or control of these financial institutions by false or fraudulent pretenses in violation of 18 USC 1344 (Bank Fraud).

90.    All of the foregoing specific examples of mail fraud, wire fraud, bank fraud and/or money laundering are separate predicate acts of racketeering activity committed by the individuals indicated on behalf of the racketeering enterprise as more fully defined and described hereafter.

91.    Despite being fully aware that James had every legal and moral right to take control of and review the business records and the like, Stocker and Harry filed a false police report claiming that James had "broken and entered" HJS' and Intrepid Ltd's offices. Stocker and Harry attempted to get James arrested. James demonstrated to the police that

it was his name on the lease of the offices, and thereby avoided arrest for the alleged
"burglary."

92.    Plaintiffs are informed, and therefore believe, that Stocker and Harry then devised a
scheme to obtain monies from an insurance company based upon false pretenses and/or
false representations. In furtherance of this scheme, Stocker, Harry and/or others of the
Harry Related Individual Defendants contacted the insurance company which insured the
premises, and falsely informed the insurance company that there had been a "burglary,"
and that property had been "stolen," and that HJS and/or Intrepid had been "damaged."
Upon information and belief, this false information was communicated through the use of
telephone systems and/or the mails. Each communication by interstate wire and/or the
mails in furtherance of this scheme to obtain monies from the insurance company for a
false "loss," constituted separate violations of 18 U.S.C. 1341 and/or 1343, and predicate
acts committed by the "racketeering enterprise" defined hereafter of which the Harry
Related Defendants are a part. Plaintiffs do not have available to them documents which
would allow them to provide more specificity at this time as to these instances of mail
and/or wire fraud, and racketeering activity, and will seek leave to amend to add further
particularity when further information is obtained

93.    Not content with gradually usurping control over the stock and money on deposit
with the various Banks and Brokerage Houses, the Harry Related Defendants were anxious
to also get control over the stocks which James had taken from the offices on July 23,
2001. Over a period of several  months, the Harry Related Individual Defendants contacted
James and attempted to negotiate a "settlement." However, as indicated, the Harry Related
Defendants had devised a scheme or artifice to defraud HJS, Intrepid, James and the other
plaintiffs, and/or  to obtain the property – including without limitation the stock certificates
owned by HJS, Intrepid, James and/or the other plaintiffs which James had taken from the
business premises on July 23, 2001 –  by means of false or fraudulent pretenses,
representations and promises.

94.    Without any intention to ever perform any of the promises which they might have to make to plaintiffs in order to obtain possession and/or control over these stock certificates, the Harry Related Defendants telephoned James on numerous occasions to try and get James to agree to meet and discuss a "settlement." Many of these telephone conversations were made over state lines when James was in Utah, and/or to Glade James – who lives in Utah.

95.    When James would not agree to meet with the Harry Related Defendants, they contacted James Bartel of Las Vegas, Nevada and solicited his help in getting James to meet and settle. In this regard, the Harry Related Defendants made one or more telephone calls from California to Bartel in Nevada which induced Bartel to agree to contact James and to try to convince James to settle. Each of the telephone calls from the Harry Related Defendants to Bartel constituted a separate violation of 18 USC 1343 (Wire Fraud).

96.    Bartel telephoned James some time in late October or early November of 2001 from Las Vegas, Nevada. James was in Malibu, California. Bartel attempted to convince James to go back to the Harry Related Defendants and give them access to the HJS and Intrepid stock which James had removed from the Harry Related Defendants' control. James refused. The Harry Related Defendants expected and encouraged Bartel to utilize the telephone as their settlement agent. This telephone call from Bartel to James was a violation of 18 USC 1343 (Wire Fraud) by the Harry Related Defendants.

97.    Upon information and belief, the Harry Related Defendants had one or more telephone conversations with Bartel after the aforementioned first telephone call that Bartel had with James. These telephone calls in furtherance of the scheme to defraud plaintiffs and/or to obtain property from plaintiffs through false pretenses, constituted violations of 18 USC 1343 (Wire Fraud).

98.    Bartel telephoned James the next day from Las Vegas, Nevada. James was still in California. In this telephone call Bartel, on behalf of the Harry Related Defendants began making promises that the Harry Related Defendants never intended to keep, but which they

27

hoped would convince James to turn over to them the HJS, Intrepid, James and other plaintiffs' stock certificates which had been in the office safe. These promises included that the Harry Related Defendants could and would start selling and/or dividing up the stock for the benefit of the plaintiffs, and that James would immediately receive substantial monies from the sale of certain Reliant Interactive Media ("Reliant") stock. This telephone call from Bartel, acting on behalf of the Harry Related Defendants, to James in California in which these false promises were made to James in furtherance of the Harry Related Defendants' scheme to defraud the plaintiffs and/or to obtain their property (the stock) through false pretenses and the like, violated 18 USC 1343. (Wire Fraud)

99.    James still refused to meet and settle. Then Greg Harry appeared at Kirt James' home in Malibu and asked James face to face to settle. James confronted Harry again with James' concerns and objections over what James perceived to be Harry's unauthorized and illegal conduct. Harry became angry and told James, "If I go to jail, you [James] will go to jail too!" James recalls replying that he – James -- did not think that he had done anything illegal, but if he had, then he (James) deserved to go to jail. Harry then threatened James; telling James not to mess with Harry because Harry could and would ruin James. The meeting ended.

100.    The Harry Related Defendants, upon information and belief, then had one or more telephone conversations from California with Bartel in Las Vegas, Nevada, in which they again solicited Bartel's help in trying to influence James to turn over the stock certificates to the Harry Related Defendants. Each of these conversations constituted separate violations of 18 USC 1343 (wire fraud).

101.    Bartels again began telephoning from Nevada to James in California, and to Glade James in Utah. Over a period of days, and in several telephone calls, Bartels reiterated the aforementioned promises of performance on behalf of the Harry Related Defendants. Bartels also told the Jameses that they needed the Harry Related Defendants' cooperation and assistance in liquidating and/or dividing up the HJS and Intrepid stocks – especially in

light of James' illness and struggles with drugs. These continuing reassurances by the Harry Related Defendants, through their chosen mouthpiece Bartel, convinced James to meet with Harry and have serious settlement discussions. Each such telephone call from Bartel to James during November of 2001 constituted a separate violation of 18 USC 1343 (Wire Fraud).

102. Finally, in mid to late November of 2001, Kirt James and Glade James traveled to Las Vegas and met with Bartel. Bartel reiterated the Harry Related Defendants' promises that if James would turn over to them the HJS and Intrepid stock certificates, the Harry Related Defendants would hold them in trust for HJS, Intrepid and James, and effect an orderly liquidation and/or division of said stock. In this way, plaintiffs would start to receive proceeds from these assets almost immediately. James had been without salary for sometime and did not have the means individually without an organization to effectively deal with so much stock. In reliance upon these promises, the James' agreed to meet with Harry.

103. The parties then met in Las Vegas – at the Four Seasons Hotel. Present were Kirt James, Glade James, James Bartel and Greg Harry. A complete accord and satisfaction and settlement agreement was reached. In exchange for solemn promises and assurances from Harry that the Harry Related Defendants would cease all improper activities and would work under James' control and/or strictures, and would hold the stock in trust for HJS, Intrepid and James until the stock was actually liquidated and/or divided up among the parties; James agreed to deliver to the Harry Related Defendants the stock certificates owned by HJS and Intrepid, including a substantial number of share certificates for positions in various companies which HJS and/or Intrepid had accumulated over the years, with the agreement that approximately 1.5 million shares of Reliant would be sold immediately and that James would get $250,000 of the proceeds of that sale, with the balance to be retained and used by the Harry Related Defendants to pay their accrued expenses. It was also agreed that these assets would be restructured, liquidated, partitioned

and/or otherwise distributed, and that James would receive not less than one third of all of the assets and stock which James delivered into the possession of the Harry Related Defendants pursuant to this agreement, and which was outstanding in various brokerage and bank accounts. It was agreed that the Harry Related Defendants would work with James in good faith and pursuant to their ongoing fiduciary duty to the plaintiffs, to appropriately liquidate and/or divide up said assets and holdings in due course.

104.    After all of the reassurances from Harry and Bartel, James – acting on his own behalf and for HJS, Intrepid and the other plaintiffs – reasonably relied upon these representations and warranties in so agreeing, and in actually delivering possession of these stock certificates to the Harry Related Defendants. James did not know that these representations and warranties were untrue when they were made. The Harry Related Defendants never had any intention to honor their representations and warranties, but rather made these false representations pursuant to their scheme to defraud the plaintiffs and to obtain possession of the plaintiffs' stock certificates through false pretenses and misrepresentations.

105.    Pursuant to this settlement agreement, James delivered to Bartels the agreed upon stock certificates, which Bartels forwarded to the Harry Related Defendants. If this stock was forwarded in the mail, then this constituted a violation of 18 USC 1341 (Mail Fraud) and 18 USC 1956 and 1957.

106.    After Stocker and the other Harry Related Defendants took possession of these stock certificates from HJS, Intrepid and James, the Harry Related Defendants sold the 1.5 million Reliant shares (which transfer was accomplished using American Registrar in Utah) for approximately $3,000,000 – but did not pay James the agreed upon $250,000 portion thereof realized from the sale of that stock. The Harry Related Defendants did not do anything else that they had agreed with the plaintiffs to do. To the contrary, upon information and belief they accelerated and put into high gear their plan and conspiracy to steal all of HJS' and Intrepid's, and therefore all of James' interest, in the assets, stocks and

business opportunities by fraudulently transferring all assets out of HJS, Intrepid Ltd., the other plaintiffs, Patagonia Development SA, Patagonia Commercial SA, Quicksilver Development SA, Marshall Worldwide LTD and Titan Capital SA (and possibly other companies like Oasis Fourth Movie), until upon information and belief said assets were believed by these wrongdoers to be beyond the control of James or any of the other plaintiffs. Upon information and belief, this was done not only to take over and essentially steal the plaintiffs' ownership and interest in these assets, but to also allow the Harry Related Defendants' complete and unfettered freedom to use and abuse HJS' and Intrepid's control over the stock and various underlying corporations. Ultimately the Harry Related Defendants, unrestrained by James' influence and control over these assets, upon information and belief have committed massive stock fraud, common law fraud, mail and wire fraud, bank fraud and money laundering.

107.   The Harry Related Defendants never intended to comply with their Las Vegas settlement agreement, but intentionally misrepresented that they would do as promised with the specific intent that James and the other plaintiffs would rely thereon in agreeing to deliver possession of the assets and stock certificates referred to above in trust to Stocker and the other Harry Related Defendants. James, for himself and all of the other plaintiffs herein, relied upon these misrepresentations, not knowing that they were untrue, to his/their substantial detriment and damage as alleged herein.

108.   At about the time that the "settlement" was finally being negotiated and finalized, and as an additional part of the Harry Related Defendants' civil and criminal conspiracy, Harry and Stocker created a false "resignation" of James from HJS and Intrepid Ltd. – and forged James' signature thereon.   Stocker and the other Harry Related Defendants thereafter mailed and/or faxed these false and forged resignations upon information and belief to each of the Banks and Brokerage Houses. Plaintiffs obtained their copies of the false and forged resignations from Union Securities in August of 2002. Union Securities told plaintiffs at that time that they had received the "resignations" from Stocker and/or

Harry in the Fall of 2001. Each act of faxing and/or mailing of these false and forged resignations constituted instances of mail and/or wire fraud because they were in furtherance of the scheme to defraud; and were predicate offenses and part of the pattern of racketeering activity of the Harry Related Defendants. Stocker used this forgery to falsely purport to take control of HJS and Intrepid Ltd. as their "custodian" -- whatever that means. Stocker and Harry back-dated this forged resignation to June 1, 2001.

109.    They also caused James to be removed as a signer on bank accounts and securities accounts through the use of this fraudulent and false "resignation," and other forged documents and misrepresentations to these banks and/or brokerage houses. The Harry Related Defendants also made false and defamatory representations to various third-parties, including to American Registrar and Richard Day in Utah and the Banks and Brokerage Houses and their employees, in furtherance of this civil and criminal conspiracy to steal and convert the plaintiffs' property. The Harry Related Defendants also caused SEC filings to be prepared and filed in connection with dozens of companies falsely stating that James was no longer involved in and/or controlling said companies. The Harry Related Defendants utilized the interstate and international mails and telephone and fax services, including to American Registrar and other entities in the State of Utah, to accomplish their criminal and fraudulent scheme. As such, they committed felony mail and wire fraud, bank fraud, forgery, perjury, the giving of false reports to government entities, securities fraud and/or market manipulation, and insurance fraud – among other crimes – during the course of their actions in the State of Utah and elsewhere.

110.    Exhibit V contains the forged "resignations" of James from HJS and Intrepid Ltd.

111.    Exhibit W contains plaintiffs' handwriting expert's opinion that the resignations are in fact forgeries.

112.    In a telephone conversation between Stocker and plaintiffs' counsel on Friday, October 10, 2003, Kirt James and Zelita Biesele (a paralegal with Steffensen Law Office), heard Stocker admit that the signatures on the "resignations" were not those of Kirt James.

113.   In the specific examples of mail and/or wire fraud cited above, there are at least two documents referenced and attached purporting to be directives from James, but which James never knew about or authorized, which are dated after the back-dated and forged "resignations." Clearly as of the dates of these two false directives, the Harry Related Defendants had not yet decided to falsify James' resignation. This obviously demonstrates that the "resignations" were not only forged, but back-dated.

114.   Shibewalt and the Dillon Trust each had accounts with Union Securities and some of the other brokerages. Harry traded in the accounts of Shibewalt and Dillon Trust at Union Securities, and some of the other brokerages, and also siphoned off stock and/or funds from these accounts. In connection with each such unauthorized trade in these accounts, each of the directives given by Harry to Union Securities or the other Brokerage Houses to trade and/or transfer stock and/or money out of said accounts constituted separate and distinct acts of wire and perhaps mail fraud. The transfer and/or transmittal of funds and/or stock out of these accounts at Harry's direction also constituted separate acts of money laundering.

115.   The Harry Related Defendants have formed other entities, such as Paladin Global Group, and have transfered assets and/or contract rights which should belong to the plaintiffs as alleged herein; and continue to trade and/or transfer stock and monies from account to account. Plaintiffs have monitored trading in the companies in which HJS and Intrepid had ownership – and which stock was transferred in trust to the Harry Related Defendants – and have noted substantial trading in the stock of one or more of these companies each trading day. Upon information and belief, the Harry Related Defendants are responsible for the bulk of this trading activity. Consequently, trading and the shuffling of stock positions is occurring almost daily – constituting daily violations of mail, wire and/or bank fraud and/or money laundering statutes in furtherance of the scheme to defraud plaintiffs.

116.   As part and parcel of this criminal conspiracy, the Harry Related Defendants have

33

usurped control over companies like Oasis Fourth Movie and Editworks (among several dozen others), and attempted fraudulently – but without legal effect – to remove James as an officer and/or director there from, and then to do deals with third-parties without James being involved and without the applicable plaintiff receiving its rightful interest and/or share of the remuneration derived there from – and without James being able to make sure that the Harry Related Defendants did not commit fraud. For example, in early 2001, the Harry Related Defendants caused a merger to occur between Last Company Clothing, Inc. and Premier ASP, Inc. The SEC filings for Last Company Clothing and Premier ASP in connection with this merger claim that James signed key agreements approving the merger. James, of course, knew nothing about this merger at that time and did not sign or approve anything. The purported surviving entity in this merger, Premier ASP, subsequently changed its name to Core Solutions, has been trading publicly and within the past year projected annual sales of some $300 million – but its entire merger was a fraud and may ultimately be set aside. HJS, Intrepid, James and/or the other plaintiffs are entitled to an accounting of any such deals, and to have any purported "removal" of James from any of these entities reversed and nullified. Plaintiffs do not yet know the full extent to which this may have been done and will seek leave to amend when full details are discovered.

117. Shortly after the Las Vegas settlement was reached and James had delivered the stock certificates in question to the Harry Related Defendants, James received a Reliant stock certificate for 57,250 shares. James quickly sold that stock and thought that the Harry Related Defendants were going to perform as they had agreed. However, James has subsequently learned that these 57,250 shares were derived from a false and fraudulent split up of a share certificate which had been owned by Oasis Entertainment.

118. On or about February 16, 2001, Stock mailed a letter to Richard Day in Salt Lake City, Utah. In this letter, Stocker asked Day to split up a certificate for 245,000 shares of Reliant common stock (Certificate # 0845) held by "Oasis Entertainment." Stocker identifies himself as "special securities counsel" for both Reliant and Oasis

34

Entertainment's Fourth Movie Project.

119.    Stocker's letter lists five underlying factors with no supporting documentation.

> "First, we note that these shares are actually owned by Oasis Entertainment's Fourth Movie Project although issued in an abbreviated name."

The name of the owner of the stock certificate is of paramount importance and inviolable in transfer without backup documentation. Stocker is saying: "trust me, this certificate is not really owned by 'Oasis Entertainment,' but rather by 'Oasis Entertainment's Fourth Movie Project." This statement is simply false.

> "Second, we note that Oasis is not an affiliate of Reliant."

Hard to believe when Stocker claims to be "special securities counsel" for both.

> "Third, the shares which underlie the surrendered certificate were authorized for issuance by Reliant in April, 1999, pursuant to §4(2) of the Securities Act of 1933"

> "Fourth, Reliant is a public SEC reporting corporation, quoted on the OTCBB and current in its reporting requirements."

120.    The February 9, 2001, letter from Stocker to Day requests that Day cancel the 245,000 share certificate and break it up and reissue it in four separate certificates in the names of James, Sifford, Rodriguez and Oasis Entertainment.

121.    Along with the February 9, 2001, letter from Stocker to Day is the original stock certificate signed by Karl Rodriguez. No evidence is attached that Rodriguez is authorized to sign for Oasis Entertainment.

122.    Attached to the certificate is a copy of supposed Minutes of the Board of Directors of Oasis Entertainment's Fourth Movie Project, (backdated), with the forged signature of Kirt James.

123.    On the very same day that Day received the request for transfer in connection with this 245,000 shares of stock, Day effected the transfer and returned to Stocker the four newly issued certificates. No questions asked. Oasis Entertainment – which is a plaintiff

herein – in fact did own those 245,000 shares of stock and has been defrauded of these shares by Stocker.

124.    All communications by mail from Stocker to Richard Day were in furtherance of the scheme to defraud Oasis Entertainment and each constituted separate and distinct acts of mail fraud (18 USC 1341).

125.    James then attempted to sell 50,000 shares of Reliant stock held in the name of HJS, but with a medallion guaranteed signature thereon – which made the stock certificate fully negotiated and bearer stock. James delivered the stock to Alpine Securities in Utah. Alpine attempted to sell the stock, but was told by Richard Day that Reliant had put a stop order on the certificate. Upon information and belief, the Harry Related Defendants used the interstate phone system and/or mails to communicate with Reliant and ask Reliant to place the above-referenced stop order on the 50,000 share certificate in furtherance of their scheme to defraud HJS, Intrepid and James. These communications from California to Florida were each separate instances of Wire and/or Mail Fraud, and racketeering predicate offenses..

126.    James and Glade James traveled to Florida to meet with Rodriguez (then general counsel for Reliant) and Tim and Kevin Harrington – the founders of Reliant. In these meetings, the Harringtons told Glade and Kirt that they would take off the hold on the shares of stock. They also told Kirt and Glade that monies and/or stock which had been owed to HJS, Intrepid, James and/or Oasis Fourth Movie Project had been "paid in full" to the Harry Related Defendants. James subsequently learned that this was not true. SEC filings for Oasis Fourth state that the settlement was not actually effected and paid until late Spring 2002.

127.    James returned to Utah, picked up the 50,000 shares of Reliant stock from Alpine Securities, and took it directly to Richard Day and asked him to transfer those shares into James' name so that James could sell them. However, by the time James was able to meet with Day, Stocker had sent letters to Day claiming that – despite the complete accord and

satisfaction and settlement agreement – James had "stolen" the stock certificate "from HJS" on July 23, 2001. The Harry Related Defendants knew and understood that this stock had been delivered to James as compensation for prior services and/or as part of James' share of the business' assets. The Harry Related Defendants knew that James rightfully owned and possessed this Reliant stock.

128.    Day received a letter for a Rule 144 sale (sale by an owner or director) from Alpine Securities, acting as broker for James, requesting that the 50,000 share certificate owned by HJS be sold on 12/1/01 for approximately $70,000.00. This request was entirely appropriate and was accompanied by a Certified Copy of Resolution of the Board of Directors of HJS, dated December 14, 1995, authorizing the HJS trading account and authorizing James to trade stock in the account on behalf of HJS.. The Resolution is signed by Stocker and identifies James as both President and Treasurer of HJS.

129.    However, even though all of the documentation submitted by Alpine on James' behalf was complete and in perfect order, Day evidently telephoned Stocker or Rodriguez regarding that transfer request because on December 18, 2001, Day received a letter from Stocker, as Counsel for HJS:

> "We regret the continuing attempts by Mr. Kirt W. James to transfer and sell securities which he does not own and to which he is not entitled." (See correspondence of that date in Exhibit W.)

130.    The December 18, 2001, letter from Stocker to Day goes on to say,

> ". . .indeed at one time, Mr. James was the President and nominal owner of HJS."

This statement by Stocker in this letter was false. Stocker had represented in numerous SEC filings for various entities that James was the founder and "sole" or "100% shareholder" in HJS.

131.    The December 18, 2001, letter from Stocker to Day further lists the officers of Intrepid International, Ltd. as James and Sifford. Stocker goes on to falsely state,

> " . . .the businesses and assets of HJS were folded into the business of Intrepid of
> Nevada then and continued to be so integrated until the present.  At the time the
> shares of Reliant were issued to HJS, HJS acted solely as a disclosed nominee of
> Intrepid International of Nevada."

There is absolutely no documentation to substantiate any of these supposed changes in
control and/or ownership of HJS and Intrepid.

132.    Also in the December 18, 2001, letter Stocker falsely claims:

> ". . . I am now the Custodian with the authority of a Sole Officer and Director"
> of HJS.

Stocker offers no proof for this astounding claim; and if it is based upon the supposed
"resignations," Stocker has already admitted that they are forgeries.

133.    On December 27, 2001, Richard Day writes to both Stocker and Alpine.  To
Stocker he writes that Day will treat Stocker's letter of December 18 as an "adverse claim."
He admits to a statutory duty to inquire into the adverse claim and relays his intention to
return the certificate to Alpine in 30 days, untransferred, unless either:

   a.   an appropriate restraining order, injunction or other process issues from a court
        of competent jurisdiction; or,

   b.   there is filed with us an indemnity bond, sufficient in our judgment to protect us
        from any loss we might suffer by complying with your adverse claim.

134.    This letter from Stocker to Day was sent in the U S Mails in furtherance of the
Harry Related Defendants' scheme to defraud the plaintiffs.  It constitutes an incident of
mail fraud (18 USC 1341).

135.    Two months later, on February 26, 2002, Stocker again wrote to Day, as Attorney-
Custodian of HJS, regarding the 50,000 shares, claiming the certificate "has been stolen
and is irretrievable."

136.    Also in the February 26, 2002, letter Stocker states:

> ". . . from the inception of HJS to this very day, I am and have been

Incorporator, Sole Director, Secretary and General Counsel of HJS."

This is inconsistent with prior information filed with the SEC (See Exhibit A as just one of dozens of filings stating the same thing filed by Stocker with the SEC) to the effect that James controlled HJS. Further, one wonders how Stocker could become the "custodian" of a corporation. Plaintiffs do not believe that there is any such thing in the law. One can be an officer, a director, a shareholder, a bankruptcy trustee or a receiver of a corporation. But Plaintiffs do not believe that there is any such thing as a "custodian" of a corporation.

137.    Attached as an exhibit to the letter from Stocker to Day on February 26, 2002, is a copy of the HJS Articles of Incorporation, dated April 23, 1991, naming Kirt James as one of two members of the Board of Directors. William Stocker is named as the second member of the Board. Stocker signed the Articles of Incorporation as the Incorporator. Vincent C. Lombardi is named as the Resident Agent. How could Stocker claim to be the "sole director" of HJS, and at the same time give to Day a copy of Articles showing that James was also a director? Stocker's statements are self-refuting. Stocker proves himself to be telling an untruth.

138.    In that letter of February 26, 2002, Stocker refers to his Attachment B, the Minutes of the First Action of Incorporator, April 25, 1991, but again obviously ignores the fact that James was appointed a Director at the time of organization of HJS. Stocker refers to the Minutes naming James President of HJS but the Minutes actually say:

> "Present were the Incorporator William Stocker, and Directors Designate Kirt W. James and William Stocker."

They go on to say under section 2. Election of Officers:

> "Kirt W. James is appointed President, and William Stocker is duly appointed Secretary and General Counsel, to serve until the next meeting of shareholders. Mr. James will act as President of this new corporation."

Stocker claims

> "There are no further organizational minutes. It appears that not only were no

shares issued, but Mr. James was never appointed as a Director of HJS."

These assertions fly in the face of literally dozens and dozens of SEC filings prepared and filed by Stocker himself as "special securities counsel" for various corporations in which HJS has or does own an interest in which it is stated under penalty of perjury that James is the sole, 100% owner of HJS.

139.    Stocker also submitted to Day the Second Action of Incorporator of HJS through which Stocker purports to issue himself 500,000 shares of HJS common stock pursuant to the Securities Act of 1933 acting as "Sole Remaining Officer/Director." There is no proof that Stocker is the "Sole Remaining Officer/Director."

140.    Again, in the February 26, 2002, letter to Day, Stocker:

> ". . . I became the sole Officer and Director. I appear to have been the sole
> director continuously, but I became the sole officer."

How can Stocker claim to have been "the sole director continuously" when the prior minutes he showed Day clearly indicated that James was also director? How can Stocker become the "sole Officer and Director" without submitting proof that James had resigned.

141.    Attached as Attachment C to the February 25, 2002, letter to Day, is evidence of another action taken by Stocker after James' request for the transfer of the 50,000 shares of Reliant:

> "In December, 2001, HJS filed its List of Officers with the State of Nevada. A
> copy is provided as Attachment C."

This listing shows Vegas Publications as Resident Agent - not Vincent Lombardi. It then lists William Stocker as President, Secretary and Treasurer of HJS.*

> *The Corporate Information on HJS now lists William Stocker as President,
> Greg Harry as Secretary and Treasurer.

142.    Also in this February 26, 2002, letter from Stocker to Day, Stocker accuses James of stealing the 50,000 share Reliant certificate. He attached the police report on the "break in" but does not attach the police report on the police interview with James wherein James

proved to the authorities that he had full authority to enter the HJS offices and that in fact it was his name on the lease. (See Exhibit C)

143.    Stocker goes on:

> "Provided as Attachment H, is my Declaration under Penalty of Perjury, pursuant to the laws of the State of California, as to facts within my personal knowledge, should it prove of additional comfort."

However, there is no Attachment H, nor is there any Attachment H included in the list of attachments.

144.    Noticeably absent from Stocker's package of Attachments to his February 26, 2002, letter to Day is any copy of the HJS Minutes of the Board of Directors and Secretary's Certification, dated August 16, 1996 and signed by Stocker:

> "Directors present were Kirt W. James and William Stocker."

> "The following Action was resolved and taken:

> The President Kirt W. James, is designated and authorized to execute and sign Stock Transfer Powers and Authorizations and any and all other necessary and proper documents to transfer stock on behalf of the Company and to give directions for the proper distribution of new certificates, if any, resulting from the cancellation of any certificates and re-issuance or new issuance of other certificates representing or effectuating the transfer of any shares of stock represented thereby."

145.    Stocker's second letter to Day was sent through the US Mails and in furtherance of the Harry Related Defendants' scheme to defraud the plaintiffs.  As such, Stocker mailing of that letter to Day violated 18 USC 1341 (Mail Fraud).

146.    In December of 2001, the Harry Related Defendants knew that James had turned control over all of their joint stock assets to them and was low on financial resources.  They deliberately sold the Reliant shares, using American Registrar in Utah, and refused to deliver the promised $250,000 to James in order to keep James from being able to afford to defend himself and to seek redress from the Harry Related Defendants for the Harry

Related Defendants' criminal and otherwise wrongful actions.

147.    The Harry Related Defendants also made every effort to make sure that James or his family could not liquidate any of their stock holdings. James had the 50,000 shares of Reliant stock, which was still in the name of HJS but had been fully negotiated as indicated above. The Harry Related Defendants knew and understood that this stock had been delivered to James as compensation for prior services and/or as part of James' share of the business' assets.    The Harry Related Defendants knew that James rightfully owned and possessed this Reliant stock. James had received other stock certificates for shares in various other entities on the same basis, some of which shares James delivered to Glade James. These share certificates had originally been owned by third-parties, but had been purchased from them and not yet turned into the transfer agent to be reissued in the new owner's name. But they were fully endorsed and negotiated, with medallion guaranteed signatures. As such they were freely transferable and essentially bearer stock. In order to keep James or Glade James from liquidating these shares and obtaining substantial proceeds there from, Stocker and Rodriguez made false representations/statements to American Registrar, Day and others in the State of Utah, and to Madison and Ajzenman, that the shares in question had been "stolen" from HJS and/or Intrepid by James. These directives were sent via interstate telephone and/or the US Mail, and were in furtherance of the Harry Related Defendants' scheme to defraud the plaintiffs and/or obtain the plaintiffs property by false pretenses. Each such directive constituted a separate violation of either 18 USC 1341 (Mail Fraud) or 18 USC 1343 (Wire Fraud). This caused James and the other plaintiffs to suffer damages to their property as a result of the civil and criminal conspiracy and racketeering activity in the State of Utah. This deprived James alone of over $125,000 in stock sales proceeds in late 2001 or early 2002.

148.    The Harry Related Defendants also caused monies and/or stock in Shibewalt and Dillon Trust accounts to be siphoned off so that neither James nor his family (children) would have any access to these funds. The Dillon Trust alone suffered a loss of $125,000

42

in one account at defendant Union Securities.

149.    As a result of this deliberate and wrongful interference with these assets, James found himself, in the Spring of 2002, destitute and facing false but serious trumped up legal charges. Plaintiffs believe that the Harry Related Defendants intended to cause James to be unjustly imprisoned and thereby incapacitated so that the Harry Related Defendants, knowingly assisted by their co-conspirators, would be free to complete their looting of the plaintiff corporations and theft of all of James' beneficiary ownership and share of the business' assets with impunity; and would be free to usurp control over and engage in unfettered wrongful and racketeering conduct with respect to the businesses and stock of not just the plaintiff corporations and trusts, but the approximately two dozen some odd other corporations.

150.    In late Spring, 2002, Lee and Fernley contacted James and offered to help him sell one of James' residences so that he could get monies to deal with his difficulties. Lee promised that if James quit-claimed the residence to Lee, she would complete the sale of the home for and on James' behalf, in trust, and then give James the net proceeds from that sale so that James could get money to pay his expenses; and that she would help James get his various expenses which had piled up paid from these proceeds. In reliance on these promises, James signed the home over to Lee. James anticipated receiving several hundred thousand dollars from the sale of this home.

151.    However, James believes and therefore alleges that the Harry Related Defendants learned that James and Jozette Jamie Lee were close to selling James' residence. In order to make sure that James stayed destitute and incarcerated, James believes and therefore alleges that the Harry Related Defendants contacted Lee, and her sister, Pam Fernley, and persuaded them to aid and abet the Harry Related Defendants in their conspiracy.

152.    Shortly thereafter, James believes that the Harry Related Defendants staged another arrest of James, pursuant to which he was incarcerated again. While James was so indisposed, Lee and Fernley completed the sale of the residence on or about June 10, 2002,

43

but rather than deliver the proceeds from that sale to James, Lee kept all of the proceeds from the sale and disappeared with her sister, Fernley, and James' daughter, Dillon. James has neither seen nor heard from Lee since that time.

153.    James also believes and therefore alleges that the Harry Related Defendants induced Lee to steal the 50,000 shares of Reliant stock which James had unsuccessfully tried to sell referred to above. Lee had offered to safeguard it for James, but when she disappeared, that stock certificate disappeared with her. Stocker's letters to Day suggest that said certificate is now in the possession of Stocker. (See Exhibit X)

154.    In the Spring of 2002, Glade James as trustee for the Chevy Chase Living Trust filed suit to collect on a demand note which had been signed by Stocker and his wife. In opposing this lawsuit, Stocker sought multiple times to file a Cross-Claim against James. In these proposed Cross-Claims Stocker made numerous false statements of fact, and attempted to sue on claims that were resolved in the accord and satisfaction/ settlement agreed upon in Las Vegas. Ultimately Stocker was not allowed to bring his Cross-Claim and Glade James was granted summary judgment.

155.    Plaintiffs filed their suit herein in the Fall of 2002 and mailed copies of it to Stocker and Harry in California and attempted to negotiate a settlement. Harry and Stocker quickly filed their own action in California State Court seeking relief for James' supposedly wrongful "break in" at the HJS and Intrepid business premises on July 23, 2001. In this California lawsuit, Stocker and Harry have again asserted positions that are contrary to the truth and in violation of the accord and satisfaction/ settlement agreement reached in Las Vegas. They do so in furtherance of their ongoing scheme to defraud the plaintiffs and/or to obtain property of plaintiffs through false pretenses. They have utilized the mails and interstate telephone to communicate various wrongful positions and/or pleadings in these cases.

156.    Stocker was the attorney for the plaintiffs and owed them a fiduciary duty as alleged hereafter. The deprivation of that fiduciary duty and good faith services is also a

44

predicate offense under 18 USC 1961 et seq.

## First Claim for Relief

157.    Plaintiffs reallege and incorporate each and every paragraph in this complaint herein as if set forth in full.

158.    Plaintiffs are entitled to an order from this Court that all of the actions taken by the defendants to change the ownership and/or control of the plaintiff corporations, and Patagonia Development SA, Patagonia Commercial SA, Quicksilver Development SA, Marshall Worldwide LTD, Titan Capital SA and B& V Union Technologies Inc. (and possibly other companies like Oasis Fourth Movie, Editworks and the like)(collectively the "Usurped Corporations"), away from James are null and void; and that James remains fully entitled to control and direct the affairs of these Usurped Corporations and the Dillon Trust – both legally and/or equitably in light of the wrongful conduct and unclean hands of the defendants.  Any interest that any of the defendants may have had in and/or to said entities and/or their assets should be declared terminated and forfeited as a consequence of their wrongful conduct.

159.    Plaintiffs are entitled to an order from this court that all actions taken by any of the Harry Related Defendants with respect to the bank and brokerage accounts of all of said Usurped Corporations were null and void.

160.    Plaintiffs are entitled to an order from this court that any transaction in any of the bank or brokerage accounts of the Usurped Corporations which were not directly authorized by James were unauthorized and must be reversed, and/or the funds and/or stocks – or the value thereof at the time – must be returned by the applicable bank and/or brokerage into the Usurped Corporations' accounts in question.

161.    For an order that the Harry Related Defendants and all entities owned and/or controlled by any of them, or acting on their behalf as nominees or otherwise – Does 1-250 -- are holding property obtained in whole or in part from the proceeds of the wrongful civil conspiracy and racketeering activity complained of herein; that said entities are holding all

such property -- both personal and real, of any nature whatsoever and wherever located, and the proceeds of the same – in constructive trust for the benefit of the plaintiffs; and that the plaintiffs have an equitable lien against all of such property in the amount of the value of the property stolen and/or converted from the plaintiffs (and that said lien should be foreclosed upon pursuant to law and further orders from this court, to satisfy all of plaintiffs' claims herein). The equitable lien should be imposed, without limitation, on all real property in the United States, including California, owned directly or beneficially by any of the Harry Related Defendants or any entity owned and/or controlled by any of them – Does 1-250 (including without limitation that real property specifically identified in Exhibit Y attached hereto), and all stock positions owned and/or controlled by HJS, Intrepid Ltd. and the other plaintiff corporations as of November 1, 2001 (and the proceeds thereof) delivered by James to the Harry Related Defendants or otherwise possessed or controlled by the Harry Related Defendants.

162.    For an order declaring that the Harry Related Defendants' interest, and that of any other entities owned and/or controlled by them – Does 1-250 -- in all such property should in equity be extinguished.

## Second Claim for Relief

163.    Plaintiffs incorporate herein by reference each and every paragraph in this complaint.

164.    There is such a unity of interest and ownership between the Harry Related Individual Defendants and the Harry Related Corporate Defendants, and Does 1-250, and the various Harry Related Defendants have cooperated together and operated the corporate defendants in such a fashion, including but not limited to the failure to comply with ordinary corporate formalities, that all of the Harry Related Defendants are clearly the agents and alter egos of one another. Further, and/or alternatively, to recognize the corporate forms of the various Harry Related Corporate Defendants would countenance and facilitate a fraud and/or inequitable result. As such, each of the Harry Related

Defendants, and their separate assets, should be held jointly and severally liable for all of the relief granted to the plaintiffs herein.

## Third Claim for Relief

165.    Plaintiffs reallege and incorporate herein by reference all of the paragraphs in this complaint.

166.    The Harry Related Defendants have alleged in pleadings filed in California that an implied if not actual partnership existed between James, Stocker, Harry and the plaintiff corporations. James does not agree that there was an actual partnership. But if any Court finds that there was a defacto partnership, then the actions of the Harry Related Defendants breached this partnership agreement, causing it to essentially be terminated.

167.    The Harry Related Defendants induced James pursuant to the Las Vegas settlement agreement to deliver custody of over $25,000,000 worth of assets to Stocker and Harry in trust and pursuant to fiduciary duties. But the Harry Related Defendants' conduct thereafter constituted a breach of this agreement, a breach of fiduciary duty and a defacto election to again terminate the parties relationship.

168.    The parties relationship, whether parrtnership or otherwise, should be formally terminated and liquidated and its affairs wound up. Plaintiffs hereby request an accounting and marshalling of all of the assets delivered by James to Stocker and Harry, wherever located/transferred -- i.e., all of the assets of the plaintiff corporations and the Harry Related Defendants and does 1-250. James is entitled to a distribution of not less than one third share of all of these assets. The Harry Related Defendants should be required to bear the costs of this accounting, liquidation and distribution as a consequence of their wrongful actions.

## Fourth Claim for Relief

169.    Plaintiffs reallege and incorporate herein by reference all of the paragraphs in this complaint.

170.    As Stocker has alleged in an attempted and trumped up legal claim against James,

that James, Stocker and Harry were required to operate HJS, Intrepid and the other affiliated entities in trust, and pursuant to partnership level fiduciary duties one to another. James agrees that Stocker and Harry and the other Harry Related Defendants' owed James and the other plaintiffs herein the highest fiduciary duty. The Harry Related Defendants' actions are gross violations of this fiduciary duty. They, and each of them, are liable to the plaintiffs for actual and exemplary damages in amounts to be determined at trial, but not less than $10,000,000 and $30,000,000, respectfully.

### Fifth Claim For Relief

171.    Plaintiffs reallege and incorporate herein by reference each and every paragraph in this complaint.

172.    Stocker has acted as counsel for James and each of the plaintiff entities over the years. Stocker has never terminated that attorney-client relationship, yet has aided and abetted – nay, actively and tortiously participated directly in – all of the wrongful conduct complained of herein. This includes without limitation advising and counseling the Harry Related Defendants in how to undertake and carry out the civil and criminal conspiracy to defraud plaintiffs and/or to obtain their money and property through false pretenses – which constitutes an egregious conflict of interest.

173.    This is a gross violation of Stocker's fiduciary duty as an attorney to the plaintiffs, and each of them, and constitutes serious malpractice.

174.    The plaintiffs, and each of them, are entitled to judgment against Stocker for actual and exemplary damages in such amounts as are determined at trial, but not less than $10,000,000 and $30,000,000 respectively.

### Sixth Claim For Relief

175.    Plaintiffs reallege and incorporate herein by reference each and every paragraph in this complaint.

176.    Rodriguez and Rodriguez Ltd have acted as counsel for James and each of the plaintiff entities over the years. Rodriguez and Rodriguez Ltd have never terminated that

attorney-client relationship, yet have aided and abetted – nay, actively and tortiously

participated directly in – all of the wrongful conduct complained of herein. This includes

without limitation advising and counseling the Harry Related Defendants in how to

undertake and carry out the civil conspiracy to steal and convert the plaintiffs' assets –

which constitutes an egregious conflict of interest.

177.    This is a gross violation of Rodriguez' and Rodriguez Ltd.'s fiduciary duty as

attorney to the plaintiffs, and each of them, and constitutes malpractice.

178.    The plaintiffs, and each of them, are entitled to judgment against Rodriguez and

Rodriguez Ltd. for actual and exemplary damages in such amounts as are determined at

trial, but not less than $10,000,000 and $30,000,000 respectively.

## Seventh Claim for Relief

179.    Plaintiffs reallege and incorporate herein by reference each and every paragraph in

this complaint.

180.    On or about May 5, 1999, HJS loaned Rodriguez and Rodriguez Ltd $375,000.

Rodriguez and Rodriguez Ltd. have not repaid this loan.  HJS is entitled to judgment

against them, jointly and severally, for the amount not repaid, plus interest thereon at the

legal rate from May 5, 1999 until paid in full, as proven at trial but not less than $375,000.

181.    HJS, Intrepid Ltd and certain other of the plaintiff corporations have made other

loans and/or advances to Rodriguez and Rodriguez Ltd. which have not been fully repaid

and/or otherwise accounted for.  Plaintiffs are entitled to an accounting as to these

loans/advances, and judgment against Rodriguez and Rodriguez Ltd. in such amounts as

are proven at trial, plus interest thereon at the legal rate from the date these amounts should

have been repaid until paid in full.

## Eighth Claim for Relief

182.    Plaintiffs reallege and incorporate herein by reference each and every paragraph in

this complaint.

183.    HJS, Oasis Entertainment and Oasis Fourth Movie made certain loans to the

Harringtons and/or Reliant which loans have never been repaid to the Plaintiffs, nor the other remuneration associated therewith delivered.

184.    To the extent that any of the Harry Related Defendants have obtained any payments and/or other performance from the Harringtons and/or Reliant with respect to the foregoing obligations, HJS, Oasis, Oasis Fourth Movie and/or James is entitled to judgment against said Harry Related Defendants in the amount of any such payments and/or performance wrongfully obtained/diverted by them from the Harringtons and/or Reliant, all as proven at trial.

### Ninth Claim for Relief

185.    Plaintiffs reallege and incorporate herein by reference each and every paragraph in this complaint.

186.    Plaintiffs believe that pursuant to the criminal civil conspiracy alleged herein, the Harry Related Defendants obtained, intercepted and/or otherwise took various stock certificates in various corporations which were owned by and/or held in constructive trust for the benefit of James and the plaintiff corporations.   The Harry Related Defendants caused said certificates to be delivered, with false and fraudulent transfer or other instructions -- usually from Stocker or Rodriguez, to Day and American Registrar, or to Madison and Ajzenman for cancellation, transfer and/or reissuance.

187.    The actions requested by Stocker or Rodriguez on behalf of the Harry Related Defendants' civil conspiracy and racketeering activities occurred in Utah and elsewhere as alleged in this complaint.  Among other things, this constituted conversion of the applicable shares.

188.    The Harry Related Defendants have stolen and converted to their own use without paying therefore (a) the assets of James and the plaintiff corporations held in trust by the Harry Related Defendants, and (b) the assets of Shibewalt and the Dillon Trust.

189.    These plaintiffs are entitled to recover from the Harry Related Defendants, and each of the other defendants which aided and abetted them in any way, the value of the assets so

converted by them, in an amount to be determined at trial, together with plaintiffs' costs

and expenses of recovering said property or the proceeds of the same from the defendants,

including their costs of suit and attorney's fees.

### Tenth Claim for Relief

190.    Plaintiffs reallege and incorporate herein by reference each and every paragraph in

191.    The Harry Related Defendants have stolen and converted to their own use without

paying therefore (a) the assets of James and the plaintiff corporations held in trust by the

Harry Related Defendants, and (b) the assets of Shibewalt and the Dillon Trust.

192.    These plaintiffs are entitled to recover from the Harry Related Defendants, and each

of the other defendants which aided and abetted them in any way, the value of the assets so

converted by them, in an amount to be determined at trial, together with plaintiffs' costs

and expenses of recovering said property or the proceeds of the same from the defendants,

including their costs of suit and attorney's fees. this complaint.

### Eleventh Claim for Relief

193.    Plaintiffs reallege and incorporate herein by reference each and every paragraph in

this complaint.

194.    The Harry Related Defendants fraudulently induced James to deliver possession of

the parties' assets, including numerous stock certificates, by falsely promising that they

would hold said assets in constructive trust and as fiduciaries for James, and the like, all as

alleged elsewhere herein.

195.    James is entitled to rescind the settlement agreement, and to receive back all of the

assets delivered to the Harry Related Defendants, including the proceeds thereof, and

wherever located.

196.    James is entitled to judgment against the Harry Related Defendants for actual and

exemplary damages in amounts to be determined at trial, but not less than $10,000,000 and

$30,000,000, respectively.

## Twelfth Claim for Relief

197.    Plaintiffs reallege and incorporate herein by reference each and every paragraph in this complaint.

198.    In addition to the wrongful conduct alleged elsewhere, the Harry Related Defendants verbally threatened, harassed and taunted James – including threatening physical harm to James.  The Harry Related Defendants' actions were shocking and extreme, and designed to inflict substantial emotional distress on James.  Defendants could reasonably foresee that their actions complained of herein would in fact cause James to suffer emotional distress.

199.    James is entitled to judgment against the Harry Related Defendants for actual and exemplary damages in amounts to be determined at trial, but not less than $10,000,000 and $30,000,000, respectively.

## Thirteenth Claim for Relief

200.    Plaintiffs reallege and incorporate herein by reference each and every paragraph in this complaint.

201.    The Harry Related Defendants induced James to enter into the relationships described herein, and to provide long and significant service to the parties' joint business activities, in reliance upon the Harry Related Defendants' continuous promises and representations that the business activities would be conducted as agreed – with James as controlling officer, director and shareholder, and Stocker as counsel and Harry as consultant.  James also relied upon these renewed types of promises when he agreed to deliver possession of HJS' and Intrepid's assets to the Harry Related Defendants for orderly liquidation/distribution pursuant to the Las Vegas Settlement Agreement.

202.    In making these representations and warranties to James, the Harry Related Defendants expected and knew that such representations and warranties would induce James to act, and such representations and warranties did in fact induce James to act as indicated.

203.    A serious injustice will result if the Harry Related Defendants were allowed to
contradict or repudiate the aforementioned representations and warranties, or to in bad
faith assert and/or claim wrongful "expenses," "setoffs," or the like against the parties'
assets, and escape liability there for.  Injustice can only be avoided by enforcing the
defendants' representations and warranties alleged above and the granting of plaintiffs'
relief requested herein.

### Fourteenth Claim for Relief

204.    Plaintiffs reallege and incorporate herein by reference each and every paragraph in
this complaint.

205.    The Harry Related Defendants have obtained possession and control of assets that
are the fruits in substantial part of the efforts of James through HJS and Intrepid Ltd.  The
Harry Related Defendants will be unjustly enriched if they are allowed to retain James'
interest in these assets and the proceeds of them without paying James the reasonable value
of his interest therein, in such amount as is proven at trial, but not less than one-third
thereof.

206.    James is entitled to judgment against the Harry Related Defendants, jointly and
severally, in an amount to be determined at trial, but not less than $10,000,000.

### Fifteenth Claim for Relief

207.    Plaintiffs reallege and incorporate herein by reference each and every paragraph in
this complaint.

208.    Not only have the Harry Related Defendants filed false police reports against
James, but Stocker has sought to assert knowingly false and trumped up claims against
James and Glade James in an attempted counterclaim and third-party complaint filed by
Stocker in opposition to an action by Glade James, as trustee of the Chevy Chase Trust, to
collect a simple demand promissory note.  As part of these claims, Stocker has lied to the
court and falsely purported to be the "custodian" of HJS and Intrepid, and sought to bring
false claims against James supposedly on behalf of these entities.  By so doing, Stocker

seeks to usurp control of these entities and to force them to take actions that will in fact damage their true and legitimate interests, and not further them. This is another example of Stocker's malpractice, breach of fiduciary duty and serious conflict of interest.

209.    These claims were filed solely to continue to deprive James and his family of any assets whatsoever – thereby keeping them as destitute as possible, and to force plaintiffs to incur continued legal expenses for the same reasons. They were also filed in continuance of the Harry Related Defendants' wrongful use and abuse of these plaintiff corporations.

210.    All of the claims that Stocker asserted in this other action are knowingly without merit, and asserted for the bad faith and improper purpose of furthering the civil conspiracy and racketeering activity complained of herein – and constitutes, therefore, an egregious abuse of process.

211.    James and Glade James are entitled to judgment against Stocker and the other Harry Related Defendants, jointly and severally, for actual and exemplary damages in amounts to be determined at trial, but not less than $100,000 and $300,000.

### Sixteenth Claim for Relief

212.    Plaintiffs reallege and incorporate herein by reference each and every paragraph in this complaint.

213.    The Harry Related Defendants have joined together in the common purpose of defrauding the plaintiffs and obtaining property and money owned and/or otherwise rightfully due to the plaintiffs through false pretenses and misrepresentation; and to deprive James of his accumulated and earned interest in the assets of HJS and Intrepid and other companies, and to loot and destroy the plaintiff corporations and trusts, and to take control over the stock and/or business affairs of the approximately two dozen other "client" corporations of HJS and Intrepid. The Harry Related Defendants employed numerous illegal and tortious acts to accomplish these common ends as alleged herein, and once purported control of the stock in the two dozen other corporations was obtained, the Harry Related Defendants and their co-racketeers have illegally bought and sold stock in these

companies, filed numerous false SEC reports relating to these companies, and otherwise committed illegal acts, all as alleged herein.

214.    The Harry Related Defendants are liable to the plaintiffs, and each of them, for actual and exemplary damages arising from this civil conspiracy in amounts to be determined at trial, but not less than $10,000,000 and $30,000,000, respectively.

## Seventeenth Claim for Relief

215.    Plaintiffs reallege and incorporate herein by reference each and every paragraph in this complaint.

216.    The Harry Related Defendants associated themselves together for the common purpose of usurping control over the plaintiff corporations and trusts, and their assets, and using this control to loot and siphon off all their assets -- including James' rightful share of said assets, for the Harry Related Defendants' mutual gain and profit; and to obtain control over the large blocks of stock in and in some cases the business affairs of approximately two dozen other companies so that they could commit various wrongful, but profitable acts with respect to said companies, their stock and/or their business affairs as alleged elsewhere herein.  As such, the Harry Related Defendants became an "enterprise" (hereinafter referred to as the "RICO" enterprise) within the meaning of 18 U.S.C. 1961(4), which enterprise consisted of the association of the Harry Related Defendants and others who knowingly joined and participated in the pattern of racketeering activity alleged herein.

217.    The RICO enterprise engaged in interstate commerce by the use of the United States mails, interstate telephone facilities and travel by the defendants between different states.  The Harry Related Defendants were and are each participants in, employed by or associated with the RICO enterprise within the meaning of 18 U.S.C. 1962 (c).

218.    In furtherance of the scheme to defraud the plaintiffs, the Harry Related Defendants and each of them repeatedly violated 18 U.S.C. 1341 (Mail Fraud), 18 U.S.C. 1343 (Wire Fraud), 18 U.S.C. 1344 (Bank Fraud) and 18 U.S.C. 1956 and 1957 (Money Laundering)

and other federal and state criminal statutes, all as alleged with more particularity above, which constitutes unlawful "racketeering activity" as defined in 18 U.S.C. 1961 (1). The racketeering defendants committed racketeering activity not only against the plaintiffs herein, but also each of the approximately two dozen other companies referred to herein, and their merger partners and innocent shareholders, and HJS' and Intrepid's insurance company. Predicate offenses have been committed from at least late Fall of 1999 through the date of this complaint and through the date of trial, and against several dozen companies - including but not limited to the plaintiffs herein – and thousands of innocent shareholders and merger and business partners of these several dozen companies.

219.    The numerous predicate acts described herein constitute an extensive and continuing pattern of racketeering activity within the meaning of 18 U.S.C. 1961(5).

220.    By jointly engaging in the conduct described above, each of the defendants conducted or participated , directly or indirectly, in the conduct of the affairs of the enterprise through a pattern of racketeering activity in violation of 18 U.S.C. 1962 (c) and 18 U.S.C. 1962(d).

221.    As a direct and proximate result of the foregoing, plaintiffs have been injured in their business or property by reason of the Harry Related Defendants' violation of 18 U.S.C. 1962(c) in a sum to be determined at trial, but not less than $10,000,000, and incidental and consequential damages related thereto to be determined at trial.

222.    Plaintiffs are entitled to judgment against defendants in an amount to be determined at trial, but not less than $10,000,000, all to be trebled as provided by law, together with plaintiffs' costs of suit and attorneys' fees.

## Eighteenth Claim for Relief

223.    Plaintiffs reallege and incorporate herein by reference each and every paragraph in this complaint.

224.    The Harry Related Defendants used and invested income that was derived from the pattern of racketeering activity alleged above in Paladin Global Group and other interstate

enterprises.

225.     The racketeering activity alleged in detail above constitutes a pattern of racketeering activity pursuant to 18 U.S.C. 1961(5).

226.     As a direct and proximate result of the Harry Related Defendants' racketeering activities and violations of 18 U.S.C. 1962(a), plaintiffs have been injured in their business and property because (a) that income constituted proceeds from property owned by plaintiffs and which is now further removed from plaintiffs, (b) which makes plaintiffs' task of recovering said proceeds more difficult, and (c) these new entities in which the income has been invested have taken up financing the legal and other efforts to frustrate plaintiffs' attempts to obtain relief and get their property back; in a sum to be determined at trial, but not less than $10,000,000, and incidental and consequential damages related thereto to be determined at trial.

227.     Plaintiffs are entitled to judgment against defendants in an amount to be determined at trial, but not less than $10,000,000, all to be trebled as provided by law, together with plaintiffs' costs of suit and attorneys' fees.

### Nineteenth Claim for Relief

228.     Plaintiffs reallege and incorporate herein by reference each and every paragraph in this complaint.

229.     The association of the Harry Related Corporate Defendants, and the plaintiff corporations while they were wrongfully under the control of the Harry Related Defendants, is an enterprise engaged in and whose activities affect interstate commerce.

230.     The Harry Related Defendants acquired and maintained interests in and control of the enterprise through a pattern of racketeering activity as detailed above.

231.     The racketeering activity alleged in detail above constitutes a pattern of racketeering activity pursuant to 18 U.S.C. 1961(5).

232.     The Harry Related Defendants have directly and indirectly acquired and maintained interests in and control of the enterprise through the pattern of racketeering

activity described above, in violation of 18 U.S.C. 1962(b).

233.    As a direct and proximate result of the Harry Related Defendants' racketeering activities and violations of 18 U.S.C. 1962(b), plaintiffs have been injured in their business and property in that (a) the legitimate business which James and/or the other plaintiffs could have performed in and/or through and/or with the entities in the enterprise has been destroyed or seriously damaged, (b) James and the plaintiffs have been deprived of the ability to carry out HJS' and/or Intrepid's business of mergers and taking companies public with the approximately two dozen separate merger candidate companies referred to above, and (c) the value of many of these companies as merger candidates may have been permanently damaged as a result of the wrongful conduct of the Harry Related Defendants with respect to these companies; and otherwise; in a sum to be determined at trial, but not less than $10,000,000, and incidental and consequential damages related thereto to be determined at trial.

234.    Plaintiffs are entitled to judgment against defendants in an amount to be determined at trial, but not less than $10,000,000, all to be trebled as provided by law, together with plaintiffs' costs of suit and attorneys' fees.

### Twentieth Claim for Relief

235.    Plaintiffs reallege and incorporate herein by reference each and every paragraph in this complaint.

236.    As set forth above, the Harry Related Defendants agreed and conspired to violate 18 U.S.C. 1962(a) (b) and (c). Specifically, they conspired to engage in a pattern of racketeering activity in violation of 1962(c) designed to defraud plaintiffs and obtain their money and/or property through false pretenses; then they conspired to use the proceeds/income from that pattern of racketeering activity to invest in one or more interstate enterprises (Paladin Global Group and other companies) in violation of 1962(a), and they have conspired to acquire or maintain interests in a portion of the enterprise through a pattern of racketeering activity in violation of 1962(b).

58

237.    The Harry Related Defendants have intentionally conspired and agreed to directly and indirectly use or invest income that is derived from a pattern of racketeering activity in an interstate enterprise, acquire or maintain interests in the enterprise through a pattern of racketeering activity, and conduct and participate in the conduct of the affairs of the enterprise through a pattern of racketeering activity. The Harry Related Defendants knew that their predicate acts were part of a pattern of racketeering activity and agreed to the commission of those acts to further the schemes described above. That conduct constitutes a conspiracy to violate 18 U.S.C. 1962(a) (b) and (c), in violation of 19 U.S.C. 1962(d).

238.    As a direct and proximate result of the Harry Related Defendants' conspiracy, the overt acts taken in furtherance of that conspiracy, and violations of 18 U.S.C. 1962 (d), Plaintiffs have been injured in their business and property in that they have lost their businesses and assets almost entirely, their businesses have essentially been destroyed, and their property and assets taken;    in a sum to be determined at trial, but not less than $10,000,000, and incidental and consequential damages related thereto to be determined at trial.

239.    Plaintiffs are entitled to judgment against defendants in an amount to be determined at trial, but not less than $10,000,000, all to be trebled as provided by law, together with plaintiffs' costs of suit and attorneys' fees.

### Twenty-First Claim for Relief

240.    Plaintiffs reallege and incorporate herein by reference each and every paragraph in this complaint.

241.    James is entitled to judgment against Lee and Fernley, jointly and severally, for actual and exemplary damages due to their fraud, breach of fiduciary duty, conversion and theft, and pursuant to the theories of promissory and equitable estoppel and unjust enrichment, in amounts to be determined at trial, but not less than $500,000 and $1,500,000, respectively.

242.    James is entitled to the imposition of a constructive trust and/or an equitable lien on

all property of Lee and Fernley which has become the repository of any portion of the funds stolen and/or defrauded from James, or which has benefited in any from those funds, and to foreclose thereon. This includes, without limitation, that real property identified on Exhibit Z attached hereto and incorporated herein by reference.

Wherefore, the Plaintiffs pray for relief pursuant to their claims against the defendants as follows:

1.    For the following declaratory and related relief:

a.    An order from this Court that all of the actions taken by the defendants to change the ownership and/or control of the plaintiff corporations, and Patagonia Development SA, Patagonia Commercial SA, Quicksilver Development SA, Marshall Worldwide LTD, Titan Capital SA and B& V Union Technologies Inc. (and possibly other companies like Oasis Fourth Movie, Editworks, and the like)(collectively the "Usurped Corporations"), away from James are null and void; and that James remains fully entitled to control and direct the affairs of these Usurped Corporations (for the benefit of their rightful shareholders) and the Dillon Trust (for the benefit of its beneficiaries) – both legally and/or equitably in light of the wrongful conduct and unclean hands of the defendants.

b.    An order declaring that any interest that any of the defendants may have had in and/or to the Usurped Corporations and/or their assets are terminated and forfeited as a consequence of their wrongful conduct.

c.    An order from this court that all actions taken by any of the Harry Related Defendants with respect to the bank and brokerage accounts of the Usurped Corporations were and are null and void.

d.    An order from this court that any transaction in any of the bank or brokerage accounts of the Usurped Corporations which were not directly authorized by James, were unauthorized and must be reversed, and/or the funds and/or stocks – or the value thereof at the time – must be returned by the applicable bank and/or brokerage defendant(s) into the

applicable Usurped Corporation's accounts in question.

   e.  An order that the Harry Related Defendants and all entities owned and/or controlled by any of them, or acting on their behalf as nominees or otherwise – Does 1-250 -- are holding property obtained in whole or in part from the proceeds of the wrongful civil conspiracy and racketeering activity complained of herein; that said entities are holding all such property -- both personal and real, of any nature whatsoever and wherever located, and the proceeds of the same – in constructive trust for the benefit of the plaintiffs; and that the plaintiffs have an equitable lien against all of such property in the amount of the value of the property stolen and/or converted from the plaintiffs (and that said lien should be foreclosed upon pursuant to law and further orders from this court, to satisfy all of plaintiffs' claims herein).; and that this equitable lien is imposed, without limitation, on all real property in the United States, including California, owned directly or beneficially by any of the Harry Related Defendants or any entity owned and/or controlled by any of them – Does 1-250 (including without limitation that real property specifically identified in Exhibits Y and Z attached hereto), and all stock positions owned and/or controlled by HJS, Intrepid Ltd. and the other Usurped Corporations as of November 1, 2001 (and the proceeds thereof) delivered by James to the Harry Related Defendants or otherwise possessed or controlled by any of the Harry Related Defendants.

   f.  An order declaring that the Harry Related Defendants' interest, and that of any other entities owned and/or controlled by them – Does 1-250 -- in all such property should in equity be extinguished.

   g.  An order declaring that there is such a unity of interest and ownership between the Harry Related Individual Defendants and the Harry Related Corporate Defendants, and Does 1-250, and that the various Harry Related Defendants have cooperated together and operated the Harry Related Corporate Defendants in such a fashion, including but not limited to the failure to comply with ordinary corporate formalities, that all of the Harry Related Defendants are clearly the agents and alter egos of one another; and that, further,

under the facts of this case if the court were to recognize the corporate forms of the various Harry Related Corporate Defendants it would countenance and facilitate a fraud and/or inequitable result; consequently, each of the Harry Related Defendants, and their separate assets, shall be jointly and severally liable for all of the relief granted to the plaintiffs herein.

      h.  For an order declaring that the parties' defacto partnership should be formally terminated and liquidated and its affairs wound up; and directing that an accounting and marshalling of all of the assets of the partnership, wherever located/transferred -- i.e., all of the assets of the Usurped Corporations and the Harry Related Defendants and Does 1-250, be accomplished;  that James is entitled to a distribution of not less than one third of all of these assets; and that the Harry Related Defendants should be required to bear the costs of this accounting, liquidation and distribution as a consequence of their wrongful actions

2.     For judgment in favor of the plaintiffs, and each of them, and against the Harry Related Defendants, jointly and severally, arising from their breach of fiduciary duty, for actual and exemplary damages in amounts to be determined at trial, but not less than $10,000,000 and $30,000,000, respectfully.

3.     For judgment in favor of the plaintiffs, and each of them, and against Stocker, arising from his breach of fiduciary duty and malpractice as attorney for the plaintiffs, for actual and exemplary damages in such amounts as are determined at trial, but not less than $10,000,000 and $30,000,000 respectively.

4.     For judgment in favor of the plaintiffs, and each of them, and against Rodriguez and Rodriguez Ltd., jointly and severally, arising from their breach of fiduciary duty and malpractice as attorney to the plaintiffs, for actual and exemplary damages in such amounts as are determined at trial, but not less than $10,000,000 and $30,000,000 respectively .

5.     For judgment in favor of HJS and against Rodriguez and Rodriguez Ltd.,  jointly and severally, in the amount of $375,000, plus interest thereon at the legal rate from May 5, 1999 until paid in full.

6.      For judgment in favor of the plaintiffs, and each of them, and against Rodriguez and Rodriguez Ltd., jointly and severally, in such amounts as are proven at trial with respect to other monies loaned and/or advanced to them, plus interest thereon at the legal rate from the date these amounts should have been repaid until paid in full.

7.      For judgment in favor HJS, Oasis, Oasis Fourth Movie and James and against the Harry Related Defendants, jointly and severally, in the amount of any payments and/or performance wrongfully obtained/diverted by them from the Harringtons and/or Reliant, all as proven at trial.

8.      For judgment in favor of James, Oasis and/ Oasis Fourth Movie and against Stocker, Sifford and Rodriguez for actual and exemplary damages relating to the cancellation of the 245,000 shares of Reliant stock in the name of Oasis Entertainment, in amounts to be determined at trial, but not less than $650,000 and $1,900,000, respectively.

9.      For judgment in favor of James and against Stocker, Rodriguez and the other Harry Related Defendants, jointly and severally, arising from the making of false statements to American Registrar and their actions which otherwise interfered with and essentially converted the 50,000 shares of Reliant stock, for actual and exemplary damages in amounts to be determined at trial but not less than $125,000 and $375,000, respectively.

10.     For judgment in favor of Glade James, individually and as trustee, and against Stocker, Rodriguez and the other Harry Related Defendants, jointly and severally, arising from their actions in interfering with the transfer and sale of several stock certificates presented to Madison , for actual and exemplary damages in amounts to be determined at trial, but not less than $100,000 and $300,000, respectively.

11.     For judgment in favor of James and against the Harry Related Defendants, jointly and severally, arising from defamation, malicious prosecution, false arrest and intentional infliction of emotional distress, for actual and exemplary damages in amounts to be determined at trial, but not less than $10,000,000 and $30,000,000, respectively.

12.     For an order that James is entitled to rescind the Las Vegas settlement agreement,

and to receive back all of the assets delivered to the Harry Related Defendants, including the proceeds thereof, wherever and however located; and directing the Harry Related Defendants to comply therewith.

13.    For judgment in favor of James and against the Harry Related Defendants, jointly and severally, arising from their intentional infliction of emotional distress, for actual and exemplary damages in amounts to be determined at trial, but not less than $10,000,000 and $30,000,000, respectively.

14.    For an order declaring that the Harry Related Defendants are estopped from contradicting or repudiating their promises, representations and/or warranties made to the plaintiffs as alleged herein, and estopped from asserting or claiming technical defenses and/or justifications for their defalcations,  and estopped from claiming the right to "expenses," "setoffs,"  or the like against the plaintiffs' assets and/or claims herein, and escape liability there for (injustice can only be avoided by enforcing these defendants' representations and warranties alleged above and the granting of plaintiffs' relief requested herein as against them).

15.    Pursuant to the claims for relief herein, for judgment in favor of James and against the Harry Related Defendants, jointly and severally,  for actual and exemplary damages in amounts to be determined at trial, but not less than $10,000,000 and $30,000,000, respectively

16.    For an order declaring that the Harry Related Defendants will be unjustly enriched if they are allowed to retain HJS' and Intrepid's, and James' equitable share thereof, business' assets and the proceeds of them without paying HJS, Intrepid and/or James the reasonable value thereof in an amount to be determined at trial, but as to James, not less than one-third of the value thereof; and that as a result thereof, judgment should be granted in favor of HJS, Intrepid and James and against the Harry Related Defendants, jointly and severally, in an amount to be determined at trial, but not less than $25,000,000.

17.    For judgment against Harry and the Harry Related Defendants, jointly and

severally, arising from their conversion to their own use without paying there for (a) the assets of James and the plaintiff corporations held in trust by the Harry Related Defendants, and (b) the assets of Shibewalt and the Dillon Trust, in the amount of the value of the assets so converted by them, as determined at trial, but not less than $25,000,000, together with plaintiffs' costs and expenses of recovering said property or the proceeds of the same from the defendants, including their costs of suit and attorney's fees.

18.    For judgment in favor of Glade James, trustee, and against Stocker and the other Harry Related Defendants, jointly and severally, arising from their egregious abuse of process in the Chevy Chase Trust v. Stocker case, for actual and exemplary damages in amounts to be determined at trial, but not less than $100,000 and $300,000.

19.    For judgment in favor of the plaintiffs, and each of them, and against the Harry Related Defendants, jointly and severally, arising from their civil conspiracy, for actual and exemplary damages in amounts to be determined at trial, but not less than $25,000,000 and $75,000,000, respectively.

20.    For judgment in favor of the plaintiffs, and each of them, and against the Harry Related Defendants, jointly and severally, arising from their racketeering activity in violation of 18 U.S.C. 1962(c), in an amount to be determined at trial, but not less than $10,000,000, all to be trebled as provided by law, together with plaintiffs' costs of suit and attorneys' fees.

21.    For judgment in favor of the plaintiffs, and each of them, and against the Harry Related Defendants, jointly and severally, arising from their racketeering activity in violation of 18 U.S.C. 1962(a), in an amount to be determined at trial, but not less than $10,000,000, all to be trebled as provided by law, together with plaintiffs' costs of suit and attorneys' fees.

22.    For judgment in favor of the plaintiffs, and each of them, and against the Harry Related Defendants, jointly and severally, arising from their racketeering activity in violation of 18 U.S.C. 1962(b), in an amount to be determined at trial, but not less than

$10,000,000, all to be trebled as provided by law, together with plaintiffs' costs of suit and attorneys' fees

23.    For judgment in favor of the plaintiffs, and each of them, and against the Harry Related Defendants, jointly and severally, arising from their racketeering activity in violation of 18 U.S.C. 1962(d), in an amount to be determined at trial, but not less than $10,000,000, all to be trebled as provided by law, together with plaintiffs' costs of suit and attorneys' fees

24.    For judgment in favor of James and against Lee and Fernley, jointly and severally, for actual and exemplary damages due to their fraud, breach of fiduciary duty, conversion and theft, and pursuant to the theories of promissory and equitable estoppel and unjust enrichment, in amounts to be determined at trial, but not less than $500,000 and $1,500,000, respectively.

25.    For an order declaring that Lee and Fernley are holding any property which is the repository of any portion of the funds they derived from the wrongful actions vis a vis James, in constructive trust for the benefit of James, and that James is entitled to an equitable lien on all property of Lee and Fernley which has become the repository of any portion of the funds stolen and/or defrauded from James, or which has benefited in any from those funds, and to foreclose thereon (this includes, without limitation, that real property identified on Exhibit Z attached hereto and incorporated herein by reference).

26.    For appropriate interest at legal and/or contractual rates on all sums awarded herein.

27.    For costs of suit and attorneys' fees.

28.    For such other relief as is appropriate under the circumstances and facts proven at trial.

TRIAL BY JURY IS DEMANDED

DATED the _13th_ day of October, 2003.

**Steffensen ♦ Law ♦ Office**

By _____

Plaintiffs' Address for the purposes of this litigation:

c/o 2159 S. 700 E., #100, SLC, Utah

Exhibits/
Attachments
to this document
have **not** been
scanned.

Please see the
case file.